JUDGE McMAHON

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

08 CV 4684

| | | |
|---|---|---|
| LEON TERRANO, | § | |
| **Plaintiff** | § | |
| | § | CIVIL ACTION NO. _____ |
| | § | |
| VS. | § | |
| | § | |
| FOSTER WHEELER LLC, ET AL. | § | |
| **Defendants.** | § | |

## FOSTER WHEELER LLC'S NOTICE OF REMOVAL

TO THE HONORABLE JUDGE OF UNITED STATES DISTRICT COURT:

Pursuant to Title 28 U.S.C. § 1442(a)(1) and 1446, Defendant Foster Wheeler LLC ("Foster

Wheeler"), gives notice of removal of an action filed against it in the Supreme Court of the State of

New York, County of New York, to the United States District Court for the Southern District of New

York. In support, Foster Wheeler respectfully offers the following:

RECEIVED
MAY 19 2008
U.S.D.C. S.D. N.Y.
CASHIERS

### Preliminary Matters

1.    On April 8, 2008, plaintiff filed this lawsuit, entitled Leon Terrano, Index No.

105079-08, against Foster Wheeler and numerous other defendants in the Supreme Court of the State

of New York, New York County. *See* Summons and Verified Complaint attached hereto as Exhibit

A.

2.    Plaintiff served Foster Wheeler with Plaintiff's Summons and Verified Complaint on

April 18, 2008. The Verified Complaint did not state Plaintiff's claims in a manner or in sufficient

detail to inform Foster Wheeler that the case was removable. *See Madden v. Able Supply Co.*, 205

F. Supp. 2d 695, 698 (S.D. Tex. 2002) (stating that if the initial pleading does not provide details of

plaintiff's claims, the 30-day time period begins on the date defendant receives "other paper" specifically indicating grounds for removal). Plaintiff's counsel also forwarded a copy of Plaintiff's Responses To Defendants' Fourth Amended Standard Set of Interrogatories ("Responses") which were received on April 18, 2008. *See* Responses attached hereto as Exhibit B. Plaintiff's Responses include allegations that plaintiff was exposed to asbestos while in the United States Navy and aboard Navy Ships between 1947 and 1952. *Id.* at Chart A. Specifically, there are allegations of exposure while working as a boilertender aboard the USS Tolovana. *Id.*

3.    Thus, this Notice of Removal is timely filed in that it is filed within thirty (30) days after the first receipt by Foster Wheeler of "other paper" from which it ascertained that this case is removable. 28 U.S.C. § 1446(b).

### Nature Of The Case

4.    The case is based on Plaintiff's allegations that Leon Terrano's asbestos-related disease, specifically lung cancer, was caused by his exposure to asbestos dust and/or fibers.

5.    Plaintiff asserts failure to warn claims against Foster Wheeler along with strict liability and negligence claims against the other defendants based on various theories.

### Grounds For Removal

6.    This Notice of Removal is filed within thirty (30) days of Plaintiff's service of Plaintiff's Responses to Defendants' Fourth Amended Standard Set of Interrogatories which constitutes "other paper". 28 U.S.C. § 1446(b). Foster Wheeler manufactured marine boilers and auxiliary equipment for use on Navy ships pursuant to contracts and specifications executed by the Navy. Foster Wheeler has confirmed that its boilers and economizers were on the USS Tolovana. The basis for removal is that, in the manufacture and sale of boilers and auxiliary equipment for the

2

Navy, including all aspects of warnings associated with that equipment, Foster Wheeler was acting under an officer or agency of the United States within the meaning of 28 U.S.C. § 1442(a)(1).

7.      Should Plaintiff file a motion to remand this case, Foster Wheeler respectfully requests an opportunity to respond more fully in writing, but offers the following authorities at this time:

8.      As recognized in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 504 (1988), Foster Wheeler has a federal defense to this action, *i.e.*, government contractor immunity from liability for injuries arising from any exposure to asbestos related to turbines on board U.S. Navy vessels, insofar as they were constructed or repaired by Foster Wheeler. Removal pursuant to 28 U.S.C. § 1442(a)(1) is appropriate where the moving party can (1) demonstrate that it acted under the direction of a federal officer, (2) raise a colorable federal defense to plaintiffs' claims, and (3) demonstrate a causal nexus between plaintiff's claims and acts it performed under color of federal office. *Mesa v. California*, 489 U.S. 121, 124-25, 129-31, 134-35 (1989).

9.      One New York Federal Court has reviewed this issue as recently as February 2004. In *Isaacson v. Dow Chemical Company*, 304 F.Supp.2d 442 (E.D.N.Y. 2004), plaintiff originally sued the manufacturer of Agent Orange in New Jersey State Court. Defendants removed to federal court asserting, among other things, federal jurisdiction under the All Writs Act. *Id.* at 445. The New Jersey District Court found removal appropriate under the All Writs Act. *Id.* The case was then transferred to the Eastern District of New York by the Multidistrict Panel. *Id.* The Court of Appeals for the Second Circuit affirmed the district court's denial of remand finding jurisdiction appropriate under the All Writs Act. *Stephenson v. Dow Chemical Company*, 273 F.3d 19 (2d Cir. 2003). On review, the United States Supreme Court remanded the case finding that the All Writs Act alone

would not support removal. *Dow Chemical Company v. Stephenson*, 539 U.S. 111 (2003). On remand from the Supreme Court, the Second Circuit determined that jurisdiction could not be grounded in the All Writs Act and remanded the case back to the Eastern District of New York to determine if there was an alternative ground supporting federal jurisdiction. *Stephenson v. Dow Chemical Company*, 346 F.3d 19 (2d Cir. 2003). It is with that extensive procedural history that the district court examined the federal officer removal statute and found it sufficient to deny plaintiff's motion to remand. *Isaacson,* 304 F.Supp. at 445.

10.    In reaching its conclusion, the *Isaacson* court discussed in detail the three elements necessary for removal under this statute. First, a defendant must demonstrate that it is a "person" within the meaning of the statute. *Id.* at 446. The definition of a "person" includes a corporation. *Id.* Second, the defendant must establish that the suit is "for any act under color of federal office," i.e., there is a causal connection between the charged conduct and asserted official authority. *Id.* (citations omitted). Causation exists if the predicate acts of the state court suit were undertaken while the person was acting as or under a federal officer, and the acts were under color of the relevant federal office. *Id.* Third, defendants must raise a colorable claim to a federal law defense. *Id.* As previously stated, a colorable claim to a federal defense can be predicated upon the federal government contractor defense. *Id.* at 449.

11.    The second element requires a causal nexus between the defendant's actions under the federal officer and plaintiff's state court claims. *Id.* at 447. A substantial degree of direct and detailed federal control over defendant's work is required. *Id.* What constitutes sufficient federal control is often central to a court's decision to uphold removal or remand a case. Several courts have upheld removal because defendants were sued as a result of building products pursuant to military

specifications. *See Crocker v. Borden*, 852 F.Supp. 1322 (E.D.La. 1994)(holding that removal was proper for Westinghouse because its marine turbines were manufactured pursuant to Navy specifications); *see also, Pack v. AC and S, Inc.*, 838 F.Supp. 1099 (D.Md. 1993)(holding that removal was proper for Westinghouse because the government had extensive control over the manufacture of turbines, even specifying the type of asbestos cloth). Not all courts agree, however, on the amount of federal control necessary to uphold removal under this statute.

12.    New York courts have not always viewed this issue consistently. Prior to the *Isaacson* case, the Eastern District Court remanded a similar matter involving Agent Orange. In *Ryan v. Dow Chemical Company*, 781 F.Supp. 934, 950 (E.D.N.Y. 1992), the district court remanded the case because it found that the control by the government was not sufficient to meet the requirements of section 1442(a)(1). The district court reasoned that the government sought only to buy a ready-to-order herbicide from the defendant and did not cause or control the production of the unwanted byproduct, dioxin, which was the alleged cause of the injuries. *Id.*

13.    In discussing *Ryan*, the *Isaacson* court acknowledged that it was a contradictory decision. *Isaacson,* 304 F.Supp. at 445. It declared, however, that the *Ryan* decision was "no longer persuasive" and went on to discuss Fifth Circuit cases that specifically rejected the *Ryan* conclusion. *See Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387, 392 (5th Cir. 1998)(holding that manufacturer of Agent Orange was entitled to removal pursuant to the federal officer removal statute); *see also, Miller v. Dow Chemical Company*, 275 F.3d 414, 417 (5th Cir. 2001)(also holding that manufacturer of Agent Orange was entitled to removal pursuant to the federal officer removal statute). The *Isaacson* court denied remand based on facts that were almost identical to those in *Ryan*. The *Isaacson* court concluded that the government ordered specifications differed from the

specifications for the defendants' commercial application of the product. *Isaacson, supra* at 450. In addition, the method of warning and application was completely in the government's hands. *Id.* Finally, the government had full knowledge of the dioxin "problem" inherent in the production of Agent Orange. *Id.* These factors demonstrated the control with which the government operated and, thus, warranted a different holding than *Ryan. Id.*

14.     This analysis also applies to "failure to warn" cases where "there is evidence that the government was involved in the decision to give, or not to give, a warning." *Kerstetter v. Pacific Scientific Co.,* 210 F.3d 431, 438 (5th Cir.) *cert. denied* 531 U.S. 919 (2000). The Court of Appeals for the Fifth Circuit has made it clear that the government contractor defense is available in "failure to warn" claims where the evidence shows that the lack of a warning reflects governmental direction or control rather than the unfettered discretion of the product's manufacturer, and applies wherever: 1) the government approved or authorized the warnings which the plaintiff contends were inadequate or incomplete; 2) the warnings provided by the manufacturer conformed to the warnings as approved or authorized by the government; and 3) the manufacturer warned the government as to any product hazards known by the manufacturer but unknown by the government. *Kerstetter,* 210 F.3d at 438.

15.     As stressed in *Kerstetter,* "[t]he government need not prepare the specifications to be considered to have approved them." *Id.* at 435. The only material issue is whether the manufacturer's designs and specifications were subjected to "substantial review" rather than a mere "rubber stamp" approval. *Id.* While this determination is necessarily fact specific, "substantial review" has plainly been shown upon evidence of a "'continuous back and forth' between the contractor and the government." *Id.* In this regard, "[t]he specifications need not address the specific defect alleged; the government need only evaluate the design feature in question." *Id.* Once again, applying these

general principles to "failure to warn" claims, the fact that governmental specifications or regulations did not specifically preclude the exact warning desired by the plaintiff does not take a "failure to warn" claim outside the scope of the government contractor defense so long as the government was involved generally as to the issue of product warnings (or specifically approved the warnings provided by the contractor) and was generally aware of the hazard in question. *Id.* at 438. Stated another way, "[i]nadequacy [of a warning] is not an issue when it is the government's warning in the first place." *Id.* at 438.

16.    The present case is also substantially similar to *Kerstetter, supra.* As explained by J. Thomas Schroppe:

> The Navy exercised intense direction and control over all written documentation to be delivered with its naval boilers...The Navy required that every piece of equipment be supplied with a defined number of copies of one or more technical manuals. Navy personnel participated intimately in the preparation of this kind of information and exercised specific direction and control over its contents. These manuals included safety information related to the operation of naval boilers and economizers only to the extent directed by the Navy.

> Furthermore, the Navy had precise specifications, practices and procedures that governed the content of any communication affixed to machinery supplied by Foster Wheeler to the Navy. Foster Wheeler would not be permitted, under the specifications, associated regulations and procedures, and especially under actual practice as it evolved in the field, to affix any type of warning or caution statement to a piece of equipment intended for installation onto a Navy vessel, beyond those required by the Navy.

*See* Affidavit of J. Thomas Schroppe attached hereto as Exhibit C at ¶¶ 21 and 22. Thus, the presence or absence of warnings regarding Foster Wheeler equipment was strictly controlled by the Navy - and a clear basis for removal exists under § 1442(a)(1).

17.    In further support of the removal, Foster Wheeler provides the Affidavit of Admiral Ben J. Lehman, U.S. Navy, Ret. *See* Affidavit of Admiral Lehman attached hereto as Exhibit D.

Admiral Lehman joined the Navy in 1942 and worked as Ship Superintendent and Planning Officer at the Brooklyn Navy Yard between 1942 and 1944, as Ship Superintendent at the San Francisco Naval Shipyard from 1950 to 1952, and as Planning Officer at the Assistant Industrial Manager Office in San Francisco from 1952 to 1054. *Id.* at ¶ 1. During his tenure in the Navy and as Ship Superintendent, Admiral Lehman was personally involved with the supervision and oversight of ship alterations and equipment over hauls at the Brooklyn Navy Yard. *Id.* at ¶ 3. Admiral Lehman states in his Affidavit the Navy controlled every aspect of the design and manufacture of equipment intended for installation on Navy vessels and that the Navy could not, and did not, permit its contractors to implement changes from military specifications. *Id.* at ¶¶ 2 and 3. He further states:

> The U.S. Navy would not have allowed its equipment suppliers, such as Foster Wheeler, to affix any warning related to any asbestos hazards on their equipment. This would have included boilers. Further, the U.S. Navy would not have allowed Foster Wheeler to place any warnings related to asbestos hazards in any written material provided by Foster Wheeler to the U.S. Navy or to a U.S. Navy contractor in accordance with its contracts, including its technical and operations manuals. To do so would have interfered with the U.S. Navy's mission and control of its ships and personnel.

*Id.* at ¶ 14.

Clearly, the Schroppe and Lehman Affidavits support federal removal jurisdiction under 28 U.S.C. § 1442(a)(1) and the federal nexus to Foster Wheeler's actions has been established.

18.    A properly removed case cannot be remanded for discretionary or policy reasons such as allegedly related State court cases or a contention that judicial economy compels remand. 28 U.S.C. § 1447(c); *Thermitron Products, Inc. v. Hermansdorfer*, 423 U.S. 336 (1976). The federal officer removal statute is not narrow or limited, and it should not be frustrated by a narrow or grudging interpretation of § 1442(a)(1). *Willingham v. Morgan*, 395 U.S. 402, 405 (1960).

8

19.    Foster Wheeler is not required to notify and obtain the consent of any other defendant in this action in order to remove Plaintiff's action as a whole under § 1442(a)(1). *See Torres v. CBS News*, 854 F.Supp. 245 (S.D.N.Y. 1994)

20.    As required by 28 U.S.C. § 1446(b) and the local rules of this Court, true and correct copies of the process and pleadings served upon Foster Wheeler are being filed with this Notice of Removal.

### Conclusion

21.    Removal of this action is proper under 28 U.S.C. § 1442, because it is a civil action brought in a state court, and the federal district courts have original jurisdiction over the subject matter under 28 U.S.C. § 1442(a)(1) because Foster Wheeler was acting under an officer or agency of the United States.

THEREFORE, Foster Wheeler LLC, pursuant to these statutes and in conformance with the requirements set forth in 28 U.S.C. § 1446, removes this action for trial from the Supreme Court of the State of New York, County of New York, on this 19th day of May, 2008.

Respectfully submitted,
**Sedgwick, Detert, Moran & Arnold LLP**
**Three Gateway Center, 12th Floor**
**Newark, New Jersey 07102**
(973) 242-0002

By: _____
Michael A. Tanenbaum

**ATTORNEYS FOR DEFENDANT:**
**FOSTER WHEELER, LLC**

### cc: Via Hand Delivery

Ambre Brandis, Esq.
WEITZ & LUXENBERG

180 Maiden Lane
New York, New York 10038-4925
(212) 558-5500
ATTORNEYS FOR PLAINTIFF

All Known Defense Counsel (via regular mail)



#10010302

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------X Index No.: 105079-08

LEON N. TERRANO,

Date Filed: 4/8/08

                                    Plaintiff(s),

Plaintiff Designates
**NEW YORK**
County as the Place of Trial

                    -against-

The Basis of Venue is
Defendants' Place of Business

A.W. CHESTERTON COMPANY,
ANCHOR PACKING COMPANY,
AURORA PUMP COMPANY,
BELL & GOSSETT COMPANY,
BMCE INC.,
    f/k/a UNITED CENTRIFUGAL PUMP,
BUFFALO PUMPS, INC.,
BYRON JACKSON PUMPS,
CBS CORPORATION, a Delaware Corporation,
    f/k/a VIACOM INC. successor by merger to CBS
    CORPORATION, a Pennsylvania Corporation,
    f/k/a WESTINGHOUSE ELECTRIC CORPORATION,
CERTAIN TEED CORPORATION,
CLEAVER BROOKS COMPANY, INC.,
CRANE CO.,
DURABLA MANUFACTURING COMPANY,
EMPIRE-ACE INSULATION MFG. CORP.,
FOSTER WHEELER, L.L.C.,
GARDNER DENVER, INC.,
GARLOCK SEALING TECHNOLOGIES LLC,
    f/k/a GARLOCK INC.,
GENERAL ELECTRIC COMPANY,
GOULDS PUMPS, INC.,
IMO INDUSTRIES, INC.,
INGERSOLL-RAND COMPANY,
ITT CORPORATION,
J.H. FRANCE REFRACTORIES COMPANY,
JENKINS VALVES, INC.,
KENNEDY VALVE MANUFACTURING Co., Inc.,
OWENS-ILLINOIS, INC.,
PATTERSON PUMP COMPANY,
PREMIER REFRACTORIES, INC.,
    f/k/a ADIENCE, INC., f/k/a BMI,
RAPID-AMERICAN CORPORATION,
THE FAIRBANKS COMPANY,
TRANE U.S. INC., f/k/a AMERICAN STANDARD INC.,
U.S. RUBBER COMPANY (UNIROYAL),
WARREN PUMPS, INC.,
WEIL-McLAIN,
    a division of THE MARLEY COMPANY,

**SUMMONS**

NEW YORK
COUNTY CLERK'S OFFICE

APR 08 2008

NOT COMPARED
WITH COPY FILE

                              Defendants.
-------------------------------------------------------------------------X
To the above named Defendant(s)




        **You are hereby summoned** to answer the **verified** complaint in this action and to serve a
copy of your answer, or, if the complaint is not served with this summons, to serve a notice of
appearance, on the Plaintiff's Attorney(s) within 20 days after the service of this summons,
exclusive of the day of service (or within 30 days after the service is complete if this summons is
not personally delivered to you within the State of New York); and in case of your failure to
appear or answer, judgment will be taken against you by default for the relief demanded in the
complaint.

Dated, April 08, 2008
        New York, New York

Defendant's address:

**SEE ATTACHED DEFENDANTS RIDER**

WEITZ & LUXENBERG, P.C.
Attorney(s) for Plaintiff
Post Office Address
180 Maiden Lane
New York, New York 10038
(212) 558-5500

DEFENDANTS' RIDER

**A.W. CHESTERTON COMPANY**
Joseph E. Riley
225 Fallon Road
Stoneham, MA 02180

**ANCHOR PACKING COMPANY**
CT Corporation System
100 Pine Street,
Suite 325
Harrisburg, PA 17101

**AURORA PUMP COMPANY**
13515 Ballantyne Corporate Place
Charlotte, NC 28277

**BELL & GOSSETT COMPANY**
8200 North Austin Avenue
Morton Grove, IL 60053

**BMCE INC.,**
    **f/k/a UNITED CENTRIFUGAL PUMP**
Weiner Lesniak LLP
Anna M. DiLonardo
888 Veterans Memorial Highway
Hauppague, NY 11788

**BUFFALO PUMPS, INC.**
874 OLIVER STREET
N. TONAWANDA, NY 14120

**BYRON JACKSON PUMPS**
5215 N. O'Conner Boulevard
Suite 2300
Irving, TX 75039

**CBS CORPORATION, a Delaware Corporation,**
    **f/k/a VIACOM INC. successor by merger to CBS**
    **CORPORATION, a Pennsylvania Corporation,**
    **f/k/a WESTINGHOUSE ELECTRIC CORPORATION**
Asbestos Litigation Support Manager
ECKERT SEAMANS CHERIN & MELLOTT, LLC
Case Management & Technology Center
USX Towers
600 Grant Street
Pittsburgh, PA 15219

**CERTAIN TEED CORPORATION**
CT Corporation System
111 8th Avenue
New York, NY 10011

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

**CLEAVER BROOKS COMPANY, INC.**
11950 West Park Place
Milwaukee, WI 11270

**CRANE CO.**
100 First Stamford Place
Stamford, CT 06902

**DURABLA MANUFACTURING COMPANY**
CLEMENTE, MUELLER & TOBIA, P.A.
218 Ridgedale Avenue
P.O. Box 1296
Morristown, NJ 07962

**EMPIRE-ACE INSULATION MFG. CORP.**
c/o THE SECRETARY OF STATE
41 State Street
Albany, NY 12207

**FOSTER WHEELER, L.L.C.**
Route 173 at Frontage Road
Clinton, NJ 08809

**GARDNER DENVER, INC.**
1800 Gardner Expressway
Quincy, IL 62301

**GARLOCK SEALING TECHNOLOGIES LLC,**
    **f/k/a GARLOCK INC.**
CT Corporation System
111 8th Avenue
New York, NY 10011

**GENERAL ELECTRIC COMPANY**
Electric Insurance Company
75 Sam Fonzo Drive
Beverly, MA 01915

**GOULDS PUMPS, INC.**
240 Fall Street
Seneca Falls, NY 13148

**IMO INDUSTRIES, INC.**
997 Lenox Drive
Suite 111
Lawrenceville, NJ 08648

**INGERSOLL-RAND COMPANY**
CT Corporation Systems
111 8th Avenue
New York, NY 10011

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

**ITT CORPORATION**
CT Corporation System
111 8th Avenue
New York, NY 10011

**J.H. FRANCE REFRACTORIES COMPANY**
SPECIAL CLAIMS SERVICES, INC.
809 Coshocton Avenue
Suite 1
Mount Vernon, OH 43050-1931

**JENKINS VALVES, INC.**
Joseph E. Sakal, Esq.
246 Bank Street
Seymour, CT 06483

and

Prentice-Hall Corporation System
30 High Street
Hartford, CT 06103

**KENNEDY VALVE MANUFACTURING Co., Inc.**
1021 East Water Street
Elmira, NY 14901

**OWENS-ILLINOIS, INC.**
One Michael Owens Way
Perrysburg, OH 43551

**PATTERSON PUMP COMPANY**
9201 Ayersville Road
Toccoa, GA 30577-9033

**PREMIER REFRACTORIES, INC.,**
  **f/k/a ADIENCE, INC., f/k/a BMI**
Special Claims Services, Inc.
809 Coshocton Avenue, Suite 1
Attention: Donald E. Ward, President
Mount Vernon, OH 43050

**RAPID-AMERICAN CORPORATION**
2711 Centerville Road
Wilmington, DE 19808

**THE FAIRBANKS COMPANY**
CT Corporation System (GA)
1201 Peachtree Street NE
Atlanta , GA 30361

**TRANE U.S. INC., f/k/a AMERICAN STANDARD INC.**
Michele Corcoran, New Filings Manager
c/o PACE
1009 Lenox Drive, Bldg 4 Suite 101
Lawrenceville, NJ 08648

**U.S. RUBBER COMPANY (UNIROYAL)**
c/o Frank Degrim, Esq.
GREENFIELD, STEIN & SENOIR
600 Third Avenue, 11th Floor
New York, NY 10016-1903

**WARREN PUMPS, INC.**
82 Bridges Avenue
Warren, MA 01083

**WEIL-MCLAIN,**
    **a division of THE MARLEY COMPANY**
500 Blaine Street
Michigan City, IN 46360

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------------X    Index No.:

LEON N. TERRANO,
                                                                             Date Filed:


                                    Plaintiff(s),

                                    -against-                           **VERIFIED**
                                                                        **COMPLAINT**

A.W. CHESTERTON COMPANY,
ANCHOR PACKING COMPANY,
AURORA PUMP COMPANY,
BELL & GOSSETT COMPANY,
BMCE INC.,
      f/k/a UNITED CENTRIFUGAL PUMP,
BUFFALO PUMPS, INC.,
BYRON JACKSON PUMPS,
CBS CORPORATION, a Delaware Corporation,
      f/k/a VIACOM INC. successor by merger to CBS
      CORPORATION, a Pennsylvania Corporation,
      f/k/a WESTINGHOUSE ELECTRIC CORPORATION,
CERTAIN TEED CORPORATION,
CLEAVER BROOKS COMPANY, INC.,
CRANE CO.,
DURABLA MANUFACTURING COMPANY,
EMPIRE-ACE INSULATION MFG. CORP.,
FOSTER WHEELER, L.L.C.,
GARDNER DENVER, INC.,
GARLOCK SEALING TECHNOLOGIES LLC,
      f/k/a GARLOCK INC.,
GENERAL ELECTRIC COMPANY,
GOULDS PUMPS, INC.,
IMO INDUSTRIES, INC.,
INGERSOLL-RAND COMPANY,
ITT CORPORATION,
J.H. FRANCE REFRACTORIES COMPANY,
JENKINS VALVES, INC.,
KENNEDY VALVE MANUFACTURING Co., Inc.,
OWENS-ILLINOIS, INC.,
PATTERSON PUMP COMPANY,
PREMIER REFRACTORIES, INC.,
      f/k/a ADIENCE, INC., f/k/a BMI,
RAPID-AMERICAN CORPORATION,
THE FAIRBANKS COMPANY,
TRANE U.S. INC., f/k/a AMERICAN STANDARD INC.,
U.S. RUBBER COMPANY (UNIROYAL),
WARREN PUMPS, INC.,
WEIL-MCLAIN,
      a division of THE MARLEY COMPANY,


                                    Defendants.

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

-------------------------------------------------------------------------X

Plaintiff(s), LEON N. TERRANO, by their attorneys WEITZ &

LUXENBERG, P.C., upon information and belief, at all times hereinafter mentioned alleges as

follows:

1.    Plaintiff(s), LEON N. TERRANO, by their attorneys, WEITZ &

LUXENBERG, P.C., for their **verified complaint** respectfully alleges:

2.    Defendant AURORA PUMP COMPANY, was and still is a duly

organized domestic corporation doing business in the State of New York.

3.    Defendant AURORA PUMP COMPANY, was and still is a duly

organized foreign corporation doing business and/or transacting business in the State of New

York and/or should have expected its acts to have consequences within the State of New York.

4.    Defendant BELL & GOSSETT COMPANY, was and still is a duly

organized domestic corporation doing business in the State of New York.

5.    Defendant BELL & GOSSETT COMPANY, was and still is a duly

organized foreign corporation doing business and/or transacting business in the State of New

York and/or should have expected its acts to have consequences within the State of New York.

6.    Defendant BUFFALO PUMPS, INC., was and still is a duly organized

domestic corporation doing business in the State of New York.

7.    Defendant BUFFALO PUMPS, INC., was and still is a duly organized

foreign corporation doing business and/or transacting business in the State of New York and/or

should have expected its acts to have consequences within the State of New York.

8.    Defendant BYRON JACKSON PUMPS, was and still is a duly organized

domestic corporation doing business in the State of New York.

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

9.    Defendant BYRON JACKSON PUMPS, was and still is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

10.    Defendant GARDNER DENVER, INC., was and still is a duly organized domestic corporation doing business in the State of New York.

11.    Defendant GARDNER DENVER, INC., was and still is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

12.    Defendant IMO INDUSTRIES, INC., was and still is a duly organized domestic corporation doing business in the State of New York.

13.    Defendant IMO INDUSTRIES, INC., was and still is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

14.    Defendant ITT CORPORATION, was and still is a duly organized domestic corporation doing business in the State of New York.

15.    Defendant ITT CORPORATION, was and still is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

16.    Defendant JENKINS VALVES, INC., was and still is a duly organized domestic corporation doing business in the State of New York.

17.    Defendant JENKINS VALVES, INC., was and still is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

18.    Defendant KENNEDY VALVE MANUFACTURING Co., Inc., was and still is a duly organized domestic corporation doing business in the State of New York.

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

19.    Defendant KENNEDY VALVE MANUFACTURING Co., Inc., was and still is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

20.    Defendant THE FAIRBANKS COMPANY, was and still is a duly organized domestic corporation doing business in the State of New York.

21.    Defendant THE FAIRBANKS COMPANY, was and still is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

22.    Defendant WARREN PUMPS, INC., was and still is a duly organized domestic corporation doing business in the State of New York.

23.    Defendant WARREN PUMPS, INC., was and still is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

Plaintiff(s), LEON N. TERRANO, repeats and realleges NYAL - WEITZ & LUXENBERG, P.C. STANDARD ASBESTOS COMPLAINT FOR PERSONAL INJURY No. 7 as if fully incorporated herein as it pertains to the defendants in the aforementioned caption.

Dated: *April 08, 2008*
New York, New York

Yours, etc.,

WEITZ & LUXENBERG, P.C

Attorneys for Plaintiff(s)
180 Maiden Lane
New York, NY 10038
(212) 558-5500

STATE OF NEW YORK        )
                                          SS:
COUNTY OF NEW YORK  )

The undersigned, an attorney admitted to practice in the Courts of New York State,

shows:

Deponent is an Associate of the firm WEITZ & LUXENBERG, P.C., Counsel for the

plaintiff(s) in the within action; deponent has read the foregoing **summons and verified**

**complaint** and knows the contents thereof; the same is true to deponent's own knowledge, except

as to the matters therein stated to be alleged on information and belief, and that as to those

matters deponent believes it to be true.  This verification is made by deponent and not by

plaintiff(s) because plaintiff(s) resides outside of the County of New York where plaintiffs'

counsel and deponent maintain their office.

Dated: April 08, 2008
       New York, New York

                                                          _____
                                                          AMBRE BRANDIS

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

Index No.:

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

LEON N. TERRANO,

Plaintiff(s),

-against-

A.W. CHESTERTON COMPANY, et. al.,

Defendants.

## SUMMONS and COMPLAINT

**WEITZ & LUXENBERG, P.C.**
Attorneys for PLAINTIFFS
180 Maiden Lane
New York, NY 10038
212-558-5500

To
Attorney(s) for

Service of a copy of the within
is hereby admitted.

Dated, April 08, 2008

.....................................

**Attorney(s) for**



W E I T Z
&
L U X E N B E R G

A PROFESSIONAL CORPORATION
· LAW OFFICES ·

180 MAIDEN LANE • NEW YORK, N.Y. 10038-4925
TEL. 212-558-5500          FAX 212-344-5461
WWW.WEITZLUX.COM



PERRY WEITZ
ARTHUR M. LUXENBERG

ROBERT J. GORDON ††

EDWARD S. BOSEK
ANDRE J. BRANDIS
EDWARD BRANIFF ††
JOHN M. BROADDUS #
DANIEL C. BURKE
PATTI BURSHTYN ††
LISA NATHANSON BUSCH
DAVID A. CHANDLER
EILEEN CLARKE
THOMAS COMERFORD ††
ADAM R. COOPER
TERESA A. CURTIN ▲▲
BENJAMIN DARCHE

CHARLES M. FERGUSON
STEVEN J. GERMAN ▲
LAWRENCE GOLDHIRSCH **
ROBIN L. GREENWALD * *
EDWARD J. HAHN *
MARIE L. IANNIELLO †*
ERIK JACOBS
GARY R. KLEIN ††
GLENN KRAMER ‡‡
JERRY KRISTAL *§
DEBBI LANDAU
JAMES C. LONG, JR. *
CURT D. MARSHALL ‡

HADLEY L. MATARAZZO *†
RICHARD S. McGOWAN *‡‡ ‡
KEITH M. O'CONNOR
MICHAEL E. PEDERSON
PAUL J. PENNOCK ‡
STUART S. PERRY *
ELLEN RELKIN *▲
STEPHEN J. RIEGEL ††
MICHAEL P. ROBERTS
CHRIS ROMANELLI ††
DAVID ROSENBAND
JIM R. ROSS ◊
JESSICA B. RUSSELL

SHELDON SILVER *
FRANKLIN P. SOLOMON §
LEMUEL M. SROLOVIC
JAMES S. THOMPSON ††
DOUGLAS D. von OISTE ‡
WILLIAM A. WALSH ††
JOSEPH P. WILLIAMS
NICHOLAS WISE
ALLAN ZELIKOVIC
GLENN ZUCKERMAN

* Of Counsel
‡ Also admitted in CT
* Also admitted in FL
‡‡ Also admitted in MA
†† Also admitted in NJ
▲ Also admitted in DC
† Also admitted in NJ and CT
** Also admitted in NJ and PA
▲ Also admitted in NJ and DC
▲▲ Also admitted in NJ and MD
◊ Also admitted in DC and TX
§ Admitted only in NJ and PA
# Admitted only in NJ
* Admitted only in DC, MD, PA and VA
+ Admitted only in CO
** Admitted only in FL
◊ Admitted only in TX

April 10, 2008

*BY Mail*

Re:  NYAL: Application to the November 2008 *In Extremis* Trial Group

Dear Counsel:

**Leon N. Terrano     Index No.  105079-08     Lung Cancer**

Enclosed, please find Plaintiff's Responses to Interrogatories and Summons & Complaint for the above.  Diagnosing medicals will be provided shortly.

Please do not hesitate to contact me with any questions or comments you may have at 212-558-5803

Respectfully submitted

Ryne Duchmann
Paralegal

215 South Monarch Street, Suite 202
Aspen, CO 81611
(970) 925-6101

210 Lake Drive East, Suite 101
Cherry Hill, NJ 08002
(856) 755-1115

76 South Orange Avenue, Suite 305
South Orange, NJ 07079
(973) 761-8995

100 E. 15th Street, Suite 400
Fort Worth, Texas 76102
(817) 885-7815

 2179-123

SUPREME COURT OF THE STATE OF NEW YORK
ALL COUNTIES WITHIN NEW YORK STATE
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
ASBESTOS                                                    Index No.:105079-08
In Re:    NEW YORK CITY
          ASBESTOS LITIGATION
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
This Document Applies To:


          Leon Terrano


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

### PLAINTIFF'S RESPONSES TO
### DEFENDANT'S FOURTH AMENDED STANDARD SET OF INTERROGATORIES
### AND REQUEST FOR PRODUCTION OF DOCUMENTS

Defendants, pursuant to CPLR 3130 and in accordance with Section VIII(A)(1)(b) of the February 19, 2003 Amended Case Management Order ("CMO"), propound the following interrogatories to plaintiffs, to be answered under oath within the time period specified by the CMO, and, pursuant to CPLR 3120 and in accordance with Section VIII (B)(2)(b) of the CMO, request that plaintiffs produce (with copies to each defendant) such documents within the time period specified by the CMO.

These interrogatories are continuing in character and require you to file supplementary answers if you obtain further or different information after serving your initial answers and before trial, including in such supplemental answers the date upon and the manner in which such further or different information came to your attention.


### EXPLANATION AND DEFINITIONS

This document constitutes both interrogatories and a request for production of documents. The documents to be produced are in each instance identified by responses to the interrogatories contained herein. Hence, for the convenience of the plaintiffs, and to prevent the need for duplicative answers, these interrogatories and this request for production of documents are being propounded concurrently.

As used in these interrogatories and document requests, the terms listed below are defined as follows. Under no circumstances should any of the terms defined below (or any instructions set forth below) be read or interpreted as a waiver of any applicable privilege under the CPLR, including but not limited to the attorney-client and work product privileges.

A.    "You," "Your," "Yourself," "Plaintiff," or "Plaintiffs" means plaintiff and all other persons acting or purporting to act on his or her

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

Page 1 of  28

behalf, other than his or her attorney.

B.    "Defendants," unless otherwise specified, means any defendant named as a party to this action as well as any predecessors in interest to any named defendants, and all other subsidiaries or divisions of any named defendants, and any Bankrupt Entity (see Exhibit A attached).

C.    "Bankrupt Entity" means any company or other entity (including parent and subsidiary companies, predecessors and successors in interest) who is a party or non-party potential tortfeasor whose Asbestos-Containing Product or Material may have contributed in any manner to plaintiff's or to plaintiff's decedent's exposure to asbestos and has filed for protection from creditors under Chapter 11 of the U.S. Bankruptcy Code. Bankrupt Entity shall include all trusts established or currently contemplated pursuant to Chapter 11 of the U.S. Bankruptcy Code, any administrative or claims processing organization established thereto, the unsecured creditors committees, the trustee in any such proceeding, and any submissions to or declarations of the bankruptcy court. Bankrupt Entity shall include all entities, without limitation, listed on Exhibit A, which list may be supplemented from time-to-time, as necessary.

D.    "Claim against Bankrupt Entity" includes, but is not limited to, any actual or stayed legal action, any proof of claim, trust claim, claims resolution, arbitration claim, liquidated claim, unliquidated claim; demand for payment, for remedy, or of liability; demand reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, equitable, secured or unsecured, toxic personal injury claims, personal injury trust claims, or any kind of claim for payment of which you have filed against Bankrupt Entities or their parent companies, successor companies or subsidiary companies.

E.    "Asbestos-Containing Product or Material" shall mean any product or material containing asbestos without regard to whether plaintiff seeks damages or other relief with respect to that product or material. The same definition shall apply to "Asbestos-Containing Product" and to "Asbestos-Containing Material."

F.    "Document" or "documents" means any writing of any kind, including originals and all non-identical copies (whether different from the originals by reason of any notation made on such copies otherwise), as well as, without limitation, correspondence, memoranda, notes, desk calendars, diaries, statistics, letters, telegrams, minutes, contracts, reports, studies, checks, invoices, statements, receipts, returns, warranties, guarantees, summaries, pamphlets, books, prospectuses, intraoffice and interoffice communications, offers, notations of any sort of conversations, telephone calls, meetings or other communications, bulletins, magazines, publications, printed matter, photographs, motion pictures, video tapes, computer printouts, teletypes, telefax, invoices, worksheets and all drafts, alterations, modifications, changes and amendments of any of the foregoing, tapes, tape recordings, transcripts, graphic or aural records or representations of any kind of which you have knowledge or which are now or were formerly in your actual or constructive possession, custody or control.

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

G.    "Possession," "custody," or "control" includes the joint or several possession, custody or control not only by the person or persons to whom these interrogatories and requests are addressed, but also the joint or several possession, custody or control by each or any other person acting or purporting to act on behalf of the person, whether as employee, attorney, accountant, agent, sponsor, spokesperson, or otherwise. This definition does not include documents in the "possession," "custody," or "control" of plaintiff's attorney unless such documents were provided by plaintiff to his/her attorney and are not privileged.

H.    "Relate," "Refer," "Pertain," and "Concern" means support, evidence, describe, comprise, constitute, analyze, discuss, report or comment on, inquiring about, setting forth, explaining, considering, referring to, relating to pertaining to or mentioning in whole or in part.

I.    "Person" means any natural person, firm, corporation, partnership, proprietorship, joint venture, organization, group of natural persons, or other association separately identifiable, whether or not such association has a separate juristic existence in its own right.

J.    "Identify," "identity," and "identification," when used to refer to an entity other than a natural person, means to state its full name, the present or last known address of its principal office or place of doing business, and the type of entity (e.g., corporation, partnership, unincorporated association).

K.    "Identify," "identity," and "identification," when used to refer to a natural person, means to state the following:

(1)    the person's full name and present or last known home address, home telephone number, business address and business telephone number;

(2)    the person's present title and employer or other business affiliation;

(3)    the person's home address, home telephone number, business address and business telephone number at the time of the actions at which each interrogatory is directed; and

(4)    the person's employer and title at the time of the actions at which each interrogatory is directed.

L.    "Identify," "identity," and "identification," when used to refer to a document, means to state the following:

(1)    the subject of the document;

(2)    the title of the document;

(3)    the type of document (e.g., letter, memorandum, telegraph, chart);

(4)    the date of the document, or, if the specific date thereof is unknown, the month and year or other best approximation of such date;

(5)    the identity of the person or persons who wrote, contributed

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

Page 3 of  28

to, prepared or originated such document; and

(6)    the present or last known location and custodian of the document.

M.    "His" means him and/or her and "he" means he and/or she.

N.    "Physician" includes doctors, nurses, other health care providers or practitioners of healing arts.

O.    "Medical condition" means any condition for which you are making a claim, including any asbestos-related disease, any pre-existing condition, or any condition allegedly brought about by an asbestos-related disease, including, but not limited to physical or mental illness, disease or injury.

## INSTRUCTIONS

A.    With respect to each interrogatory, in addition to supplying the information asked for and/or identifying the specific documents referred to, identify all documents which were referred to in preparing your answer thereto.

B.    If any document identified in an answer to an interrogatory was, but is no longer, in your possession or subject to your custody or control, or was known to you but is no longer in existence, state what disposition was made of it or what became of it.

C.    If any document is withheld from production hereunder on the basis of a claim of privilege or otherwise, identify each such document and the grounds upon which its production is being withheld.

D.    A release for a record retrieval service to obtain from the Social Security Administration a record of plaintiff's employment and earnings history should be signed by plaintiff (or the person with proper authority). A separate release for each workers' compensation claim file referred to in these interrogatories should be signed by plaintiff (or the person with proper authority) and returned to the record retrieval service. A separate authorization for a record retrieval service to obtain plaintiff's employment records from each employer identified or referred to in these interrogatories should be signed by the plaintiff (or the person with proper authority). A separate authorization for a record retrieval service to obtain plaintiff's medical records, radiographs and pathology materials from each health care provider and each hospital or medical facility identified or referred to in these interrogatories should be signed by the plaintiff (or the person with property authority). An authorization for a record retrieval service to obtain plaintiff's income tax returns from the Internal Revenue Service for the past ten years should be signed by the plaintiff (or the person with proper authority).

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

E.    You are requested to furnish all information in your possession and all information available to you, not merely such information as you possess of your own personal knowledge but also all knowledge that is available to you, your representatives, attorneys, physicians and other agents, by reason of inquiry, including inquiry of their representatives. Where a response to the following interrogatories sets forth information that is not based upon your own personal knowledge, but rather upon the knowledge of your representatives and other agents, you should so indicate in your response to that interrogatory.

F.    Each interrogatory includes, but is not limited to, requests for information that relate to Bankrupt Entities.

G.    Documents produced which have been submitted in connection with a claim against a Bankrupt Entity and are not otherwise obtainable independently from a Bankrupt Entity are presumptively confidential and may not be disclosed other than to counsel, a party, the court or an expert in this action without consent of the Court. Nothing in these instructions precludes offering these documents as evidence at trial should the documents be ruled admissible by the Court. To the extent any such documents are submitted to the Court, they should be submitted in a manner that will protect their confidential status.

H.    Any portion of any document produced which indicates an amount demanded, offered or accepted in settlement shall be redacted to prevent disclosure of same.

    Plaintiffs reserve their right to supplement any portion of these interrogatories. In addition, plaintiffs respond to defendants' standard interrogatories without conceding relevancy, materiality or admissibility.

## PRELIMINARY STATEMENT AND OBJECTIONS

    Plaintiff, by and through her attorneys objects to Defendants' Fourth Amended Standard Set Of Interrogatories And Request For Production Of Documents, as well as the Explanation and Definitions and Instructions contained therein ("Interrogatories"), to the extent that they seek to impose upon plaintiff obligations or burdens which are greater than, or inconsistent with New York law.

Plaintiff further objects to these Interrogatories and to each individual request and/or interrogatory, to the extent that they seek information or request the production of documents that are protected from disclosure by the attorney-client privilege, the work product doctrine, and any other applicable privilege or doctrine protecting such documents from disclosure. The production of any document prepared by the plaintiff's attorneys is not a waiver of any privilege. The inclusion of or reference to any attorney's name on any responses is not a waiver of any privilege. Moreover, the documents produced are confidential and may not be disclosed other than to counsel, a party, the court or an expert in this action without order of the Court. Plaintiff, by providing documents in response to these Interrogatories specifically does not admit the competency, relevancy, materiality, privilege and/or admissibility of such document or of the information or subject matter.

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

Should any such disclosure by Plaintiff occur, it is inadvertent and shall not constitute a waiver of any privilege.

Plaintiff has not completed investigating the facts relating to her case, has not completed her discovery, and has not completed preparing her case. Therefore, these responses are preliminary and without prejudice to plaintiff's right to discover and/or produce evidence of additional facts and/or additional evidence of existing facts. Plaintiff has made a good faith effort to respond to the Interrogatories, but reserves the right to object to, and to move to have vacated, all of these Interrogatories.

Plaintiff objects to the Interrogatories, and to each individual request and/or interrogatory, to the extent that they seek information that is not within plaintiff's own first-hand knowledge or request the production of documents that are not within plaintiff's possession, custody or control.

Plaintiff further objects to the Interrogatories as overly broad and burdensome and demanding an investigation into matters which are neither relevant to these proceeding nor designed to lead to the discovery of evidence relevant to these proceedings.

Plaintiff does not waive and specifically preserves the following objections:

1.  Any and all objections to the competency, relevancy, materiality, privilege and admissibility of the information or the subject matter thereof, as evidence for any purpose and any proceeding in this action (including trial) and in other actions.

2.  The right to object on any grounds at any time to demand for further responses or further documents to these or any other discovery requests or other discovery proceedings involved or related to the subject matter of the discovery to which information or documents are provided; and,

3.  The right at any time to review, correct, add to, supplement or clarify any of these responses.

These objections are incorporated by reference into any amendment and/or supplement to these interrogatories. Moreover, each of these objections is incorporated by reference into to each specific response without regard to whether an additional objection is made in such response.

Subject to these objections and reservations, plaintiff, by and through her attorneys responds as follows:

INTERROGATORY ANSWERS
For
LEON TERRANO

1Q.   State the following:
    (a)   your full name, and all other names by which you have been known;
    (b)   age, and date and place of birth;
    (c)   whether you were an adopted child;

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

Page 6 of  28

(d)  present marital status, date of current marriage, spouse's
     maiden name, date of any prior marriages and the names of
     any prior spouses, if applicable

(e)  present home address; and

(f)  social security number.

1A.  (a)  Leon Terrano;
     (b)  79,01/10/1929, Corona, Queens, NY;
     (c)  Birth;
     (d)  Married,05/07/55,Carol Baker;
     (e)  6007 50th Avenue, Woodside, NY 11377;
     (f)  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.

2Q.  State the following with regard to your father and mother:
     (a)  names;
     (b)  current address (if deceased, state last known address);
     (c)  the current condition of each one's health, including any
          specific medical problems. If either of your parents are
          deceased, please state for each deceased parent:
               i.    specific physical problems;
               ii.   date and place of death;
               iii.  age and cause of death for each parent.

2A.  (a)  Father: Nicholas Terrano;
     (b)  3117 Coach Place, East Elmhurst, NY;
     (c)  Deceased
          i.    None;
          ii.   06/48, East Elmhurst;
          iii.  55, Cardiac Arrest.

     (a)  Mother: Cecelia Terrano;
     (b)  19808 53rd avenue, Flushing, NY;
     (c)  Deceased
          i.    Diabetic;
          ii.   01/10/82, Flushing, NY;
          iii.  80, internal bleeding.

3Q.  State the following with regard to each of your children:
     (a)  full name;
     (b)  the date of birth;
     (c)  sex;
     (d)  current address (if deceased, state the last known address)
     (e)  social security number;
     (f)  whether birth child or adopted child;
     (g)  current state of each one's health. If any of your children
          are deceased, state for each deceased child:
               i.    specific physical problems;
               ii.   date and place of death; and
               iii.  age and cause of death for each child.

3A.  (a)  Leon Terrano;

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

Page 7 of  28

(b)    08/25/56;
(c)    Male;
(d)    232 87th avenue, Bellerose, NY 11427;
(e)    Unknown;
(f)    Birth;
(g)    Good.


(a)    Stephen Terrano;
(b)    05/20/58;
(c)    Male;
(d)    505 Pacing Way, Westbury, NY 11590;
(e)    Unknown;
(f)    Birth;
(g)    Good.


(a)    David Terrano;
(b)    03/28/63;
(c)    Male;
(d)    6007 50th Avenue, Woodside, NY 11377;
(e)    Unknown;
(f)    Birth;
(g)    Good


(a)    Vincent Terrano;
(b)    11/28/1969;
(c)    Male;
(d)    6080 60th avenue, Maspeth, NY 11378;
(e)    Unknown;
(f)    Birth;
(g)    Good

4Q.    State the complete address of all places you have resided since birth giving the inclusive dates of residence for each place named and as to each state:
(a)    fuel used for heating and cooking;
(b)    significant home improvements (e.g., additions, reinsulation, re-wiring, etc.);
(c)    number of family units co-occupying said structure.

4A.    1962 to Present    6007 50th Avenue, Woodside, NY 11377;

(a) Heating: Gas, Cooking, Gas;
(b) No;
(c) 3 person home.


1955 to 1962    4837 47th street, Woodside, NY 11377;
(a) Heating: Oil, Cooking: Gas;
(b) No;
(c) 4 person Apt.

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

1952 to 1955    3117 Couch Place, East Elmhurst, NY 11369;

(a) Heating: Oil; Cooking: Gas;
(b) No;
(c) 8 Person Home.

1929 to 1952    3320 102nd street, Corona, Queens, 11368;
(a) Heating: Coal; Cooking: Gas
(b) Unknown;
(c) 10-12 Person Home.

5Q.    For every physician or other health care provider who ever tested, treated, consulted with or examined you up to and including the present date, for any reason whatsoever, please state the following separately as to each:

(a)  name and address of physician or health care provider and, if ongoing, the approximate frequency of said treatment and services;
(b)  date(s) of test, examination and/or treatment;
(c)  symptoms complained of at the time, if any;
(d)  any diagnosis made;
(e)  treatment or examination given and reason for treatment or examination; and
(f)  any drugs or medications prescribed.

5A.    Although it is possible that the plaintiff consulted other doctors, nurses and health care providers, at the present time, plaintiff is aware of the following doctors and treatment rendered:

(a)    (1995 to Present) Robert Lombardo, 169 E. 78th Street, Primary Care.
(b-f) See medical records.

(a)    (2006 to Present) Marc Nolan, 90 East End Avenue, NY 10028, Cardiologist.
(b-f) See medical records.

(a)    (March 2008) Dr. Goldstone, 125 East 74th street, NY 10021, Oncologist.
(b-f) See medical records.

(a)    (March 2008) Dr. Rogers, Pulmonologist, 63rd St. and Park Avenue, NY 10068.
(b-f) See medical records.

(a)    (March 24th to Present) Dr. Harry Raftopoulos, 450 Lakeville Road, Lake Success, NY, 11042, Oncologist.
(b-f) See medical records.

(a)    (March 20th to 2008) Dr. Dillon, Radiology Pathologist.

6Q.    For every hospital, clinic or health care institution in which you have ever been admitted, treated, tested, or examined, whether as an "in-patient" or as an "out- patient," please state the following for each such visit:

    (a)    name and address of the facility;

    (b)    dates and description of test, treatment, examination or hospitalization and, if ongoing, the approximate frequency of said treatment and services; and

    (c)    reason for visit to the facility.

6A.    Although it is possible that plaintiff may have been treated or examined in other institutions, at the present time plaintiff is aware of the following institutions and treatment rendered:

    (a)    2008 Monter Cancer Center, 450 Lakeville Road, Lake Success, NY, 11042;

    (b)    See medical records;

    (c)    Chemotherapy.

    (a)    2007, Lennox Hill,100 E 77th Street, New York, NY 10021;

    (b)    See medical records;

    (c)    Unknown.

    (a)    1999, Columbia Presybeterian, 630 West 168th Street, New York, NY 10032;

    (b)    See medical records;

    (c)    Carotid Endorectomy.

    (a)    1998, St. Luke's Hospital, 1090 Amsterdam Avenue, New York, NY 10025;

    (b)    See medical records;

    (c)    Stroke.

    (a)    1997, Lennox Hill,100 E 77th Street, New York, NY 10021;

    (b)    See medical records;

    (c)    Appendectomy.

    (a)    1981, Boulevard Hospital, 56-45 Main Street, Flushing, NY 11355;

    (b)    See medical records;

    (c)    Heart attack.

7Q.    State each of your asbestos-related injuries and/or diseases, describe the nature of those symptoms that you contend are related to your asbestos-related condition(s), and state the date when you first experienced each such symptom and the date of diagnosis and the name of any diagnosing physician and, if different, indicate the date you first became aware of the diagnosis.

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

7A.    Plaintiff was diagnosed with Lung Cancer in March of 2008. At various and numerous times, plaintiff has experienced a variety of different and differing symptoms related to his injury which are numerous and frequent.

8Q.    Describe any pain, incapacity, inability to lead a normal life, inability to work, or disability (including retirement) alleged to have resulted from your medical conditions), including the date and basis therefore.

8A.    Since his diagnosis with Lung Cancer, plaintiff has experienced increasing shortness of breath, fear of cancer, mental and emotional distress, and inconvenience. Plaintiff's asbestos-related condition has disrupted his life, limiting him in his everyday activities and interfered with his living a normal life.

9Q.    Have you ever had any biopsies or tissue samples taken? If so, please state for each such procedure:

    (a)    the name of the physician performing such procedure;

    (b)    the address where such procedure was performed;

    (c)    the date when such procedure was performed; and

    (d)    the results, conclusions, and/or diagnosis arising from such procedure.

9A.    (a-d) Plaintiff has had biopsies and/or tissue samples taken at hospitals, but the medical records may or may not reflect other locations. See answers 5 and 6 and medical records.

10Q.    Have you ever had any chest x-rays, CT Scans and/or pulmonary function tests? If so, state:

    (a)    the dates and places;

    (b)    the reasons;

    (c)    the results and/or diagnosis resulting therefrom;

    (d)    the location of all chest X-ray films and CT Scans; and provide appropriate authorization to obtain all X-rays, CT Scans and pulmonary function tests.

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

10A.  Plaintiff has had chest x-rays, CT Scans, and pulmonary function tests performed at various locations but the medical records may or may not reflect other locations. See answers 5 and 6 and medical records.

11Q.  Have you ever been exposed to, used, inhaled or ingested any of the following substances on a regular basis or at work. If so, state the date(s), place(s), and circumstances thereof.

| | | |
|---|---|---|
| V.    acids | VI.    aluminum | VII.    arsenic |
| VIII. barium | IX.    beryllium | X.    butanol |
| XI.   cadmium | XII.   Carborundum | XIII. chloreothylene |
| XIV.  chlorine | XV.    chromate | XVI.  chromite |
| XVII. chromium | XVIII.coal dust (coal) | XIX.   coal tar |
| XX.   cotton dust | XXI.   epoxy | XXII. ethanol |
| XXIII.grinding dust | XXIV.  iron | XXV.  isocyanates |
| XXVI. isopropanol | XXVII. lead | XXVIII. live chickens |
| XXIX. manganese | XXX.  nickel | XXXI.nitrogen dioxide |
| XXXII. nuclear radiation | XXXIII.ozone | XXXIV.petroleum distillates |
| | | XXXVII. silica |
| XXXV. phosgene | XXXVI. radiation | XL. welding smoke or fumes |
| XXXVIII. titanium | XXXIX.toluene | |
| XLI. zylene | XLII. zinc. | |

11A.  At various times during his employment but not necessarily on a regular basis, Plaintiff may have been unknowingly exposed to some of these substances.

12Q.  Do you use or have you ever used cigarettes, cigars, pipes, smokeless tobacco, or any other tobacco substance, from birth to the present time? If so, state the following:

(a)    the brand and type of tobacco product(s) used (e.g., filter, non-filter, chewing tobacco);

(b)    the dates during which you used each such product;

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

Page 12 of  28

(c)  the amount of the product used per day, during each period of time (e.g., 2 packs of cigarettes per day);

(d)  whether you have ever been told by a physician that you are or were suffering from any disease or illness caused by or contributed to by tobacco; and

(e)  whether you were ever advised by any physician or any other person that use of tobacco products could adversely affect your health and whether you were ever advised to stop using tobacco products, and if so, identify each physician or person who gave you any such advice, the dates on which the advice was given, and state exactly what, if anything, you did in response to that advice.

12A.  (a) Camels, non-filtered; True, filtered,

(b) 05/1947-05/1952;05/1958-1981;

(c) 1 pack a day;

(d) No. Plaintiff was never told by a physician that he is or was suffering from any disease or illness caused by or contributed to by tobacco;

(e) Client was informed that smoking could damage his heart after his stroke in 1981 and quit shortly thereafter.

13Q.  For each spouse and member of your household, from your birth to the present time, state whether they use or have ever used cigarettes, cigars, pipes, smokeless tobacco, or any other tobacco substance, and if so, state the following:

(1)  the brand and type of tobacco product(s) used (e.g., filter, non-filter, chewing tobacco); and

(2)  the dates during which they used each such product.

13A.  (a) True, filtered;

(b) 05/1955-1990.

14Q.  Do you presently consume or have you in the past consumed alcoholic beverages.  If so, state the following:

(1)  the type of alcoholic beverages consumed;

(2)  the dates during which you consumed each such alcoholic beverage;

LAW OFFICES
OF.
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

(3) the amount of such beverage you consumed each day; and

(4) whether you have ever been treated for any illness or disease related to your consumption of alcoholic beverages.

14A. Plaintiff states that he has consumed alcoholic beverages only on social/weekend occasions.

15Q. Have you ever been a member of the Armed Forces of the United States?  If so, state the following:

(1) the branch of the service, serial number, and highest rank held;

(2) the beginning and ending dates of your military service;

(3) the type of discharge that you received; and

(4) whether you sustained any injuries or incurred any illness during military service;

(5) if you received a medical discharge, attach a copy hereto and set forth the medical reasons.

15A. (a) Navy, 2275478, Sgt.;

(b) 05/1947-05/1952;

(c) Honorable;

(d) N/A;

(e) N/A.

16Q. As to each and every employer (including military service) you have had form the time you were first employed to the present, set forth the following:

(Use the attached Chart A)

Include on the chart all employers where you have worked, and all job sites , regardless of whether or not you believe you were exposed to asbestos during the employment. Also include the source of any product identification information provided on Chart A.

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

Page 14 of  28

16A. See attached; defendants are also directed to plaintiff's social security printout which will be obtainable from RecordTrak.

17Q.  Please state the following with respect to each Asbestos-Containing Product identified on Chart A:

(a)   the color, dimensions, shape, form, texture, weight, appearance and flexibility of each product;

(b)   the appearance of the package or container indicating the manner of packaging, size, dimensions, color and weight; and

(c)   the name, logo, label, numerical and alphabetical markings and other markings or words including warnings on the product and package or container.

17A.  <u>Plaintiff</u> recalls, at the present time, that he was exposed to a variety of different asbestos containing products, during his employment as an Automatic, Boilertender, and Maintenance Worker including but not limited to: pipecovering, block, cement, cloth/clothing, fireproofing spray, gaskets, firebrick, tape, sheetrock, compound, floor tile, ceiling tile, brakes, clutches, engine gaskets and insulation used on equipment such as boilers, pumps and turbines which products were manufactured by various companies, some of which the plaintiff may identify at his deposition.

<u>Plaintiff's counsel</u> alleges that, at the present time and upon information and belief, the plaintiff was exposed to asbestos-containing products manufactured by, or insulation used on equipment manufactured by, or was exposed to asbestos due to the negligence of, the defendants named in the Plaintiff's lawsuit as well but not limited to some of the companies (or their legal predecessors) listed on Exhibit A: UNR Industries, Johns-Manville, Amatex, Forty-Eight Insulations, PACOR, Celotex, National Gypsum, Eagle-Picher, H.K. Porter, Keene, Rockwool, M.H. Detrick, Rutland Fire & Clay, Babcock & Wilcox, Pittsburgh Corning, Burns & Roe, Owens Corning, Armstrong World Industries, G-1 Holdings, W.R. Grace, United States Gypsum, Federal Mogul, Eastco Industrial Safety, North American Refractories, Kaiser Aluminum, Plibrico Refractories, Porter-Hayden, Harbison-Walker Refractories, A.P. Green, Alra Group, and others.

<u>Plaintiff's counsel</u> further states that identification of the manufactures, sellers, distributors and users of the products to which the plaintiff was exposed, as well as any and all tort-feasors liable to plaintiff for causing or contributing to his contraction of an asbestos-related disease may be established by other witnesses, Interrogatory Answers of the tort-feasors, sales invoices and other evidence.

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

Plaintiff and Plaintiff's counsel reserve the right to amend and/or supplement this answer, as additional information becomes available.

18Q.  If you have retired from your employment, set forth the following:
   (a)  whether said retirement was voluntary or involuntary;
   (b)  the effective date of said retirement;
   (c)  the name of your employer at the time of retirement;
   (d)  the reason for your retirement;
   (e)  whether your retirement was related to any claimed asbestos-related injury; and
   (f)  the amount of pension and/or retirement benefits you are receiving or entitled to receive.

18A.  (a)  Voluntary;
    (b)  01/91;
    (c)  City of New York, Dept. of Higher Education;
    (d)  Age;
    (e)  No;
    (f)  $1200.

19Q.  State whether you were exposed (either directly, through a co-worker or otherwise), to any Bankrupt Entity's Asbestos-Containing Materials, or products either mined or manufactured, sold, or distributed by a Bankrupt Entity.  If so, state the following:
   (a)  As to each and every employer (including military service) you have had from the time you were first employed to the present, set forth the following, concerning Bankrupt Entities' products only:
    i.    Name of employer;
    ii.   Dates of employment;
    iii.  Asbestos-related jobsite and address where Bankrupt Entity's products were being used;
    iv.   Dates you were at the jobsite;
    v.    Job duties at the particular jobsite;
    vi.   Bankrupt Entity's asbestos-containing materials or products to which you were exposed;
    vii.  Other companies using Bankrupt Entity's asbestos-containing materials or products at the jobsite; and
    viii. Whether you received any warnings with respect to the use of said product and the nature of those warnings.

   (b)  If you were exposed to, used, ingested or inhaled any Bankrupt Entity's Asbestos-Containing Products at any time other than in the scope of your employment, state for each such exposure:
    i.    the date, location and circumstances; and
    ii.   the type of product and the name of the manufacturer, distributor, and miner.

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

Page 16 of  28

19A.   See Answer to Question 17.

20Q.   If you were exposed to, used, ingested or inhaled asbestos or asbestos-containing products at any time other than in the scope of your employment, state for each such exposure:
    (a)   the date, location and circumstances; and
    (b)   the type of product and the name of the manufacturer, distributor, and miner.

20A.   Plaintiff states that he is unaware of any non-occupational exposure.

21Q.   Have you ever been a member of any labor union? If so, state:
    (a)   the name and address of each local, national and international labor union;
    (b)   the inclusive dates of your membership; and
    (c)   any positions you have held with each such labor union, and the dates during which you held such positions.

21A.   (a)   Local DC 37, ACME, AFL-CIO;
    (b)   1973-1991,;
    (c)   Member.

22Q.   State whether you have ever seen or received any information, instruction, direction, warning, or directive, from any source whatsoever, concerning alleged dangers of exposure to asbestos or asbestos-containing products, and if so, identify:

    (a)   each such warning, directive, notification, direction, instruction, or information;
    (b)   the means by which such was given to you;
    (c)   the source and the date on which it was received by you; and
    (d)   your response or reaction, including any complaints made or changes in work habits.

22A.   Plaintiff states that he was never warned of the harmful effects of exposure to asbestos.

23Q.   State whether you had available for use during any period of your employment, respirators or masks or other dust inhalation inhibitor, or protective gear and, if so, state the following:

    (a)   the period of time during which said items were available;
    (b)   what instructions were given with regard to the use of each of said items;
    (c)   whether you used said items and the dates of your use;
    (d)   whether you ever requested said items, and, if so, when, where and to whom the request was made, and the response to the request.

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

23A.  Plaintiff states that he does not have a recollection of masks becoming available until later on in his career, at which time they were available only sporadically.

24Q.  If you are making a claim for loss of earnings or impairment of earning power because of your medical conditions, state the following:

(a)  date of commencement of any loss or impairment;

(b)  the name and address of your employer, your job title and your monthly or weekly rate of pay at the time of the alleged commencement of any loss or impairment;

(c)  if you had more than one employer during the three year period prior to the date of the commencement of any loss or impairment, as indicated on Chart A, provide your monthly or weekly rate of pay and inclusive dates of such employment during the three year period;

(d)  your total earnings for the period of three years prior to the commencement of any loss or impairment;

(e)  the inclusive dates during which you allege that you were unable to work as a result of any loss or impairment and the total amount of pay you claim you lost because of this absence;

(f)  the date on which any loss or impairment ended; and

(g)  your monthly or weekly rate of pay which you have received, from the date of any loss or impairment ended through the present time.

24A.  (a-g) N/A;

25Q.  Do you claim damages for loss of consortium, society, affection, services, or sexual enjoyment? If so, please set forth in complete detail all facts on which this claim is based, including a complete description of the loss suffered.

25A.  Yes. Due to plaintiff's injuries and symptoms as described in Interrogatory Answer #7, the marital relationship between plaintiff and his spouse has been fundamentally altered and severely damaged. Plaintiff's spouse has been deprived of the support and services formerly provided by plaintiff. Plaintiff's debilitated condition has hampered the ability to provide the love, solace and emotional support previously enjoyed by and relied upon by plaintiff's spouse as integral elements of their sacred marital relationship.

26Q.  For each person who is or was partially or totally dependent upon you for financial support and assistance during the last ten years, state:

(1)  the name, address, sex, age and relationship; and

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

Page 18 of  28

(2)    the amounts you contributed during the last ten years for support and assistance.

26A.  Plaintiff states as follows:
(1)    Mrs. Terrano, wife, see answer 1(d),
(2)    Plaintiff provided partial support for his wife for all and part of the past ten years.

27Q.  State, in the form of an itemized list, all special damages alleged in this lawsuit including, but not limited to, hospital charges, medical charges, medicines, lost wages, etc., naming the person or organization to whom each item of expense was paid or is due, and, if paid, by whom each item of expense was paid.

27A.  Plaintiff's counsel is presently coordinating this information, which will be forwarded upon receipt; defendants are also directed to records received from RecordTrak.

28Q.  Identify and give the substance of all written statements, recordings, or videotapes which relate to the facts of this lawsuit and the damages you claim given by plaintiff or any witness (provided such information is in plaintiff's possession, custody or control and/or such statements, recordings or videotapes are not protected by attorney-client privilege) in the above-captioned matter.

28A.  Objection.  Unduly broad and vague.  Subject to the objection, Plaintiff responds as follows:  At this time, Plaintiff has no such written statements, recordings, or video tapes which relate to the facts of this lawsuit, and has no basis for knowing of any witnesses except for those previously listed.

29Q.  Have you ever made any claim for, or received any, health or accident insurance benefits, social security benefits, state or federal benefits for disabilities, workers' compensation benefits, veterans' benefits, tort claims or suits, Federal Employers Liability Act claims or suits, Longshoremen and Harbor Workers Act claims or suits, unemployment compensation insurance benefits, or early payment from any public or private pensions due to disability or your medical condition?  If so, state the following:

a.    the date and place where each such claim was made;
b.    the name and nature of the entity with which the claim was made;

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

    c.    any identifying number, such as a docket or petition number, for each claim;

    d.    the defendant, agency, insurer, employer or other entity to or against whom the claim was made and its file number;

    e.    the nature of the claim;

    f.    whether you were examined by a physician and if so, the name and address of that physician;

    g.    the result of such claim, including the amount realized by way of settlement, judgment or award upon the claim;

    h.    the name and address of any attorney who represented you with regard to such claims; and

    i.    whether you are presently receiving such benefits.

29A.  (a)    1991;
    (b)    Social Security Retirement Benefits;
    (c)    Unknown;
    (d)    Social Security Administration;
    (e)    Retirement Benefits;
    (f)    No;
    (g)    Plaintiff is currently receiving about $1100 a month;
    (h)    N/A;
    (i)    Plaintiff is currently receiving benefits.
          (Please fill in if receiving pension)

    (a)    1991;
    (b)    New York City of Higher Education;
    (c)    Unknown;
    (d)    N/A;
    (e)    Pension;
    (f)    N/A;
    (g)    $1200 a month;
    (h)    N/A;
    (i)    Yes.

30Q.  State the following with regard to your asbestos-related legal action:

    (a)    Did you file an asbestos-related claim in more than one jurisdiction;

    (b)    Identify all of the jurisdiction(s) where an asbestos-related claim has been filed (whether or not these claims have been dismissed or discontinued or otherwise resolved) on your behalf;

    (c)    Did you file your asbestos-related claim(s) under more than one Index Number; and

    (d)    Provide all of the Index Numbers for all of your asbestos-related claim(s), including all multiple Index Numbers for claims filed in New York County.

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

30A.  Plaintiff's counsel, on behalf of plaintiff, has filed only this lawsuit, in New York State, County of New York, under Index Number (105079-08).

31Q.  State whether or not you have made, filed, or submitted a Claim Against Bankrupt Entity or received funds in settlement from a Bankrupt Entity.  If so, for each claim state the following:

(a)   the date and place where each such claim was made;

(b)   the name and nature of the entity with which the claim was made;

(c)   any identifying number, such as a docket or petition number, for each claim;

(d)   the defendant, agency, insurer, employer or other entity to or against whom the claim was made and its file number;

(e)   the nature of the claim;

(f)   whether you were examined by a physician and if so, the name and address of that physician; and

(g)   whether you received any compensation as a result of such claim, but not the amount.

31A.  Plaintiff's counsel, on behalf of plaintiff, has not filed claims against any Bankrupt Entities.

32Q.  State whether you have applied to any Bankrupt Entity or Bankruptcy Court to lift the stay as to your claim or otherwise have attempted to join a Bankrupt Entity to this action.

32A.  Neither plaintiff nor plaintiff's counsel on plaintiff's behalf has applied to any Bankrupt Entity or bankrupt Court to lift the stay as to plaintiff's claim or otherwise attempted to join a Bankrupt Entity to this action.

33Q.  Have you or your spouse ever been a party to or a witness in any lawsuit, court or administrative proceeding?  If so, please state:

(a) whether you or your spouse were a party or witness and if party, whether plaintiff or defendant;

(b) the precise name of the lawsuit or proceeding, the court agency in which it was brought and the docket number;

(c) the nature of the charges or claims and, if you or your spouse were a witness, the subject matter of the testimony; and

(d) the disposition of the case.

33A.(a)   No;
    (b)   N/A;
    (c)   N/A;
    (d)   N/A.

34Q.  Have you or your spouse filed a claim seeking compensation for any alleged asbestos-related condition from any entity, including settlement trusts?  Specify "Yes" or "No" only.

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

34Q.  See Answer to Question 31.

35Q.  Identify all entities, whether or not parties to this lawsuit, with whom you have settled or agreed to settle this lawsuit.

35A.  Plaintiff has not settled with any parties at this point in time.

36Q.  Identify all persons, other than your attorneys, who provided you with any information used in answering these interrogatories, and state the particular information each person supplied.

36A.  The plaintiff relied upon himself in answering these interrogatories except where indicated otherwise.

## REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to Section VIII (B)(2)(b) of the CMO, the defendants request that plaintiffs produce for inspection and copying, the documents and things identified below.  The documents and things identified herein shall be produced for inspection and copying at such time as the answers to the interrogatories herein are filed.  The following requests include, but are not limited to, documents that relate to Bankrupt Entities.

You are hereby requested to produce the following documents and things:

1.  All documents identified in your answers to these interrogatories.

    R.1.  All the documents in our possession are attached.

2.  All documents relating to the plaintiff's job qualifications and professional licenses held.

    R.2.  To the extent that any exist, they will be provided.

3.  All documents relating to the plaintiff's membership in any labor trade association or professional organization.

    R.3.  To the extent that any exist, they will be provided.

4.  All documents relating to the plaintiff's military or foreign service, including and not limited to, personnel records, discharge papers, military occupational specialty qualification, promotions, reductions or disciplinary actions.

    R.4.  To the extent that there are an available, RecordTrak has been provided with a duly executed authorization.

5.  All documents relating to any claim or demand ever made by the plaintiff or the plaintiff's decedent for damages, compensation or other benefits allegedly resulting from any illness or injury,

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

including but not limited to, Claims Against Bankrupt Entities, Industrial Accident Board records, social security disability claim records, federal or state employment compensation claim records, social disability records, pension claim record or any other health or accident insurance claim records.

R.5. See attached or To be provided (or N/A).

6. All documents in the plaintiff's possession. custody or control relating in any way to the plaintiff's exposure or possible exposure to asbestos, asbestos-containing products and/or asbestos-containing materials.

    R.6. Objection, attorney/client privilege; to the extent that this request does not invade such privileges, Plaintiff does not have any such material.

7. All documents relating in any way to the plaintiff's exposure or possible exposure to silica, acids, beryllium, nuclear radiation, ammonia, cadmium, chlorine, chromates, phosgene, grinding dust, coal dust, cotton dust, nickel, welding smoke or fumes.

    R.7. Plaintiff does not specifically recall if he was ever exposed to the substances listed, but nonetheless does not have any of the materials asked for.

8. All documents, of which you have ever become aware, relating in any way to warnings, potential health hazards, instructions or precautions regarding the use or handling of, or exposure to, asbestos, asbestos-containing products, and/or asbestos-containing materials.

    R.8. To the extent that there are any available, RecordTrak has been provided with a duly executed authorization.

9. All applications prepared or submitted by or on behalf of the plaintiff for life insurance, medical insurance, health and accident insurance, and/or disability insurance.

    R.9. Plaintiff has no such documents in his possession.

10. All statements, recorded interviews, films, videotapes, reports, questionnaires, forms or other documents made, submitted, compiled, prepared or filled out by, on behalf of, or under the direction of, plaintiff relating in any way to exposure or alleged exposure to asbestos, asbestos-containing products and/or asbestos-containing materials or any other issues relating to this lawsuit, except that information prepared by, for, or at the request of plaintiff's counsel must be identified (including the date made), but need not be produced without any order by the Court, provided that written or recorded communication between

LAW OFFICES
OF.
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

plaintiff and counsel, made after an attorney-client relationship has been established need not be produced or identified.

R.10. Objection.  Attorney/client privilege; work product privilege.  To the extent that this request does not invade any such privilege, Plaintiff does not have any such material.

11.   All records relating to comments, complaints, suggestions, or proposals made to your employer or your union, by yourself or by other employees or union members regarding asbestos exposure.

R.11. Plaintiff has no such material in his possession.

12.   All written, recorded, filmed, transcribed or videotaped statements of all parties and non-party declarants pertaining to the subject of this lawsuit, except that information prepared by, for, or at the request of plaintiff's counsel must be identified (including he date made), but need not be produced without an order by the Court, provided that written or recorded communication between plaintiff and counsel, made after an attorney-client relationship has been established need not be produced or identified.

R.12. Objection.  Attorney/client privilege; work product privilege.  To the extent that this request does not invade any such privilege, Plaintiff does not have any such material.

13.   All photographs of the plaintiff at work or in work clothes and all photographs of all products or conditions complained of in the plaintiff's place of employment.

R.13. To the extent that they exist, they will be provided.

14.   Copies of all itemized bills covering all the special damages and losses and expenses claimed in this matter.

R.14. To be provided; Defendants are also directed to RecordTrak.

15.   Copies of all reports, correspondence and records from any doctor who has examined the plaintiff, any hospital where plaintiff has been treated either as an inpatient or as an outpatient, except for any reports, records, correspondence, or communications issued by any consulting physicians who have been retained or specially employed in anticipation of litigation or preparation for trial and who are not expected to be called as a witness at trial.

R.15. RecordTrak has all available medical records.

16.   All tissue specimens, tissue slides, and x-ray films  pertaining to the plaintiff.

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

R.16. RecordTrak has all available medical records.

17.    Copies of plaintiff's income tax records for the last ten years as well as any other documents, including economic loss reports, upon which plaintiff relies in support of his claims. If loss of earnings or earning capacity is alleged or claimed to have occurred before the current year, include copies of the income tax returns of the plaintiff from ten years prior to the claimed loss and up to the current tax year.

R.17. RecordTrak has all available income tax records.

18.    Any asbestos and/or asbestos-containing products of the type to which the plaintiff alleges exposure which the plaintiff has in his possession, custody or control.

R.18. To the extent that any exist, they will be provided.

19.    All photographs, charts, drawings, diagrams or other graphic representations depicting work conditions at work sites where plaintiff claims he was exposed to asbestos or asbestos-containing products.

R.19. To the extent that any exist, they will be provided.

20.    All invoices, bills, statements and any other writings or records which plaintiff contends evidence the sale of any products containing asbestos to the place of plaintiff's employment at which plaintiff claims that he was exposed to asbestos.

R.20. To the extent that any exist, they will be provided.

21.    Any written advice, publication, warnings, order, directive, requirement, or recommendation, which advised or warned of the possible harmful effects of exposure to or inhalation of asbestos or asbestos-containing products in the possession, custody or control of the plaintiff.

R.21. Plaintiff has no such material in his possession.

22.    Any accident or incident reports which relate to the facts, circumstances or incidents which form the basis of plaintiff's complaint.

R.22. To the extent that any exist, they will be provided.

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

Dated:     New York, New York

April 10, 2008

Respectfully submitted

WEITZ & LUXENBERG, P.C.
Attorneys for Plaintiff

By: _____
        Ambre Brandis, Esq.
        180 Maiden Lane
        New York, NY 10038
        (212) 558-5500

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

## EXHIBIT A

Bankrupt Entity includes, without limitation: UNR Industries, Inc., Johns-Manville Co., Amatex Corp., Waterman Steamship Corp., Wallace & Gale Co., Forty-Eight Insulations, Inc., PACOR, Prudential Lines, Inc., Standard Insulations, Inc., US Lines, Nicolet, Inc., Gatke Corp., Chemetron Corp., Raytech, Delaware Insulations, Celotex Corp., Hillsborough Holdings, National Gypsum Co., Standard Asbestos Mfg. & Insul., Eagle-Picher, H.K. Porter Co., Cassiar Mines, Keene Corp., American Shipbuilding, Inc., Lykes Brothers Steamship, Rock Wool Mfg., SGL Carbon, M.H. Detrick, Brunswick Fabricators, Fuller-Austin Insul., Harnischfeger Corp., Joy Technologies, Rutland Fire & Clay, Babcock & Wilcox, Pittsburgh Corning, Burns & Roe Enterprises, E.J. Bartells, Owens Corning, Armstrong World Industries, G-1 Holdings (GAF Corp.), W.R. Grace, Skinner Engine Co., USG (US Gypsum) Corp., Federal Mogul, Eastco Industrial Safety Corp., Washington Group Int'l, Inc., Bethlehem Steel, North American Refractories, Kaiser Aluminum, Plibrico Refractories, Porter-Hayden, American Club, Huxley Development Corp., Harbison-Walker Refractories Co., Continental Producers Corp., A.P. Green Indus., Shook & Fletcher, Atra Group, Inc. (Synkoloid), and ACandS, Inc; C.E. Thurston.

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

CHART A

EMPLOYER/JOBSITE HISTORY FOR LEON TERRANO

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

| Name of Employer | Dates of Employment | Asbestos-related Jobsite & Address | Dates You Were at Jobsite | Job Duties | ACM* Used Personally, By Coworkers, BY Other Companies On Site And To Which You Were Otherwise Exposed | Coworkers on Jobsite, including supervisor |
|---|---|---|---|---|---|---|
| See Social Security Printout | 1947-1952 | Navy<br><br>USS Tolovana (AO-64)<br><br>USS Necles (AC-47)<br><br>Pf 70 (USS Evansville)<br><br>DE 534 USS Silverstein | 1947-1952 | Boilertender | see Interrogatory Answer #17 | see Interrogatory Answer #17 |
| See Social Security Printout | 1952- 1957 | Neptune Meter, Long Island City | 1952- 1957 | Assembled Water Meters | see Interrogatory Answer #17 | see Interrogatory Answer #17 |
| See Social Security Printout | 1957-1971 | Westside Peirs, 88-96 | 1957-1971 | Longshoreman Forklift operator | see Interrogatory Answer #17 | see Interrogatory Answer #17 |
| See Social Security Printout | 1971-1979 | Hunter College, Lexington Avenue and 69th avenue | 1971-1979 | General Maintenance | see Interrogatory Answer #17 | see Interrogatory Answer #17 |
| See Social Security Printout | 11/1979- 01/1991 | Hunter College High School, Park Avenue and 94th street | 11/1979- 01/1991 | Maintenance Supervisor | see Interrogatory Answer #17 | see Interrogatory Answer #17 |

* ACM - Asbestos Containing Materials or Products.
** Identify brand and manufacturer names, if known.

Page 28 of 28

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK ——————————————————X   Index No.: 105079-08

LEON N. TERRANO,                                           Date Filed: 4/8/08

                                    Plaintiff(s),          Plaintiff Designates
                                                           **NEW YORK**
                                                           County as the Place of Trial

          -against-
                                                           The Basis of Venue is
                                                           Defendants' Place of Business

A.W. CHESTERTON COMPANY,
ANCHOR PACKING COMPANY,                                    **SUMMONS**
AURORA PUMP COMPANY,
BELL & GOSSETT COMPANY,
BMCE INC.,
     f/k/a UNITED CENTRIFUGAL PUMP,
BUFFALO PUMPS, INC.,
BYRON JACKSON PUMPS,
CBS CORPORATION, a Delaware Corporation,
     f/k/a VIACOM INC. successor by merger to CBS
     CORPORATION, a Pennsylvania Corporation,
     f/k/a WESTINGHOUSE ELECTRIC CORPORATION,
CERTAIN TEED CORPORATION,
CLEAVER BROOKS COMPANY, INC.,
CRANE CO.,
DURABLA MANUFACTURING COMPANY,
EMPIRE-ACE INSULATION MFG. CORP.,
FOSTER WHEELER, L.L.C.,
GARDNER DENVER, INC.,
GARLOCK SEALING TECHNOLOGIES LLC,
     f/k/a GARLOCK INC.,
GENERAL ELECTRIC COMPANY,
GOULDS PUMPS, INC.,
IMO INDUSTRIES, INC.,
INGERSOLL-RAND COMPANY,
ITT CORPORATION,
J.H. FRANCE REFRACTORIES COMPANY,
JENKINS VALVES, INC.,
KENNEDY VALVE MANUFACTURING Co., Inc.,
OWENS-ILLINOIS, INC.,
PATTERSON PUMP COMPANY,
PREMIER REFRACTORIES, INC.,
     f/k/a ADIENCE, INC., f/k/a BMI,
RAPID-AMERICAN CORPORATION,
THE FAIRBANKS COMPANY,
TRANE U.S. INC., f/k/a AMERICAN STANDARD INC.,
U.S. RUBBER COMPANY (UNIROYAL),
WARREN PUMPS, INC.,
WEIL-MCLAIN,
     a division of THE MARLEY COMPANY,

NEW YORK
COUNTY CLERK'S OFFICE

APR 0 8 2008

NOT COMPARED
WITH COPY FILE

                                        Defendants.
                                                        ————X
——————————————————————————————————————————
To the above named Defendant(s)


        **You are hereby summoned** to answer the **verified** complaint in this action and to serve a
copy of your answer, or, if the complaint is not served with this summons, to serve a notice of
appearance, on the Plaintiff's Attorney(s) within 20 days after the service of this summons,
exclusive of the day of service (or within 30 days after the service is complete if this summons is
not personally delivered to you within the State of New York); and in case of your failure to
appear or answer, judgment will be taken against you by default for the relief demanded in the
complaint.

Dated, April 08, 2008
        New York, New York


Defendant's address:

**SEE ATTACHED DEFENDANTS RIDER**

                                          WEITZ & LUXENBERG, P.C.
                                          Attorney(s) for Plaintiff
                                          Post Office Address
                                          180 Maiden Lane
                                          New York, New York 10038
                                          (212) 558-5500

## DEFENDANTS' RIDER

**A.W. CHESTERTON COMPANY**
Joseph E. Riley
225 Fallon Road
Stoneham, MA 02180

**ANCHOR PACKING COMPANY**
CT Corporation System
100 Pine Street,
Suite 325
Harrisburg, PA 17101

**AURORA PUMP COMPANY**
13515 Ballantyne Corporate Place
Charlotte, NC 28277

**BELL & GOSSETT COMPANY**
8200 North Austin Avenue
Morton Grove, IL 60053

**BMCE INC.,**
  **f/k/a UNITED CENTRIFUGAL PUMP**
Weiner Lesniak LLP
Anna M. DiLonardo
888 Veterans Memorial Highway
Hauppague, NY 11788

**BUFFALO PUMPS, INC.**
874 OLIVER STREET
N. TONAWANDA, NY 14120

**BYRON JACKSON PUMPS**
5215 N. O'Conner Boulevard
Suite 2300
Irving, TX 75039

**CBS CORPORATION, a Delaware Corporation,**
  **f/k/a VIACOM INC. successor by merger to CBS**
  **CORPORATION, a Pennsylvania Corporation,**
  **f/k/a WESTINGHOUSE ELECTRIC CORPORATION**
Asbestos Litigation Support Manager
ECKERT SEAMANS CHERIN & MELLOTT, LLC
Case Management & Technology Center
USX Towers
600 Grant Street
Pittsburgh, PA 15219

**CERTAIN TEED CORPORATION**
CT Corporation System
111 8th Avenue
New York, NY 10011

**CLEAVER BROOKS COMPANY, INC.**
11950 West Park Place
Milwaukee, WI 11270

**CRANE CO.**
100 First Stamford Place
Stamford, CT 06902

**DURABLA MANUFACTURING COMPANY**
CLEMENTE, MUELLER & TOBIA, P.A.
218 Ridgedale Avenue
P.O. Box 1296
Morristown, NJ 07962

**EMPIRE-ACE INSULATION MFG. CORP.**
c/o THE SECRETARY OF STATE
41 State Street
Albany, NY 12207

**FOSTER WHEELER, L.L.C.**
Route 173 at Frontage Road
Clinton, NJ 08809

**GARDNER DENVER, INC.**
1800 Gardner Expressway
Quincy, IL 62301

**GARLOCK SEALING TECHNOLOGIES LLC,**
    **f/k/a GARLOCK INC.**
CT Corporation System
111 8th Avenue
New York, NY 10011

**GENERAL ELECTRIC COMPANY**
Electric Insurance Company
75 Sam Fonzo Drive
Beverly, MA 01915

**GOULDS PUMPS, INC.**
240 Fall Street
Seneca Falls, NY 13148

**IMO INDUSTRIES, INC.**
997 Lenox Drive
Suite 111
Lawrenceville, NJ 08648

**INGERSOLL-RAND COMPANY**
CT Corporation Systems
111 8th Avenue
New York, NY 10011

**ITT CORPORATION**
CT Corporation System
111 8th Avenue
New York, NY 10011

**J.H. FRANCE REFRACTORIES COMPANY**
SPECIAL CLAIMS SERVICES, INC.
809 Coshocton Avenue
Suite 1
Mount Vernon, OH 43050-1931

**JENKINS VALVES, INC.**
Joseph E. Sakal, Esq.
246 Bank Street
Seymour, CT 06483

and

Prentice-Hall Corporation System
30 High Street
Hartford, CT 06103

**KENNEDY VALVE MANUFACTURING Co., Inc.**
1021 East Water Street
Elmira, NY 14901

**OWENS-ILLINOIS, INC.**
One Michael Owens Way
Perrysburg, OH 43551

**PATTERSON PUMP COMPANY**
9201 Ayersville Road
Toccoa, GA 30577-9033

**PREMIER REFRACTORIES, INC.,**
    **f/k/a ADIENCE, INC., f/k/a BMI**
Special Claims Services, Inc.
809 Coshocton Avenue, Suite 1
Attention: Donald E. Ward, President
Mount Vernon, OH 43050

**RAPID-AMERICAN CORPORATION**
2711 Centerville Road
Wilmington, DE 19808

**THE FAIRBANKS COMPANY**
CT Corporation System (GA)
1201 Peachtree Street NE
Atlanta , GA 30361

TRANE U.S. INC., f/k/a AMERICAN STANDARD INC.
Michele Corcoran, New Filings Manager
c/o PACE
1009 Lenox Drive, Bldg 4 Suite 101
Lawrenceville, NJ 08648

U.S. RUBBER COMPANY (UNIROYAL)
c/o Frank Degrim, Esq.
GREENFIELD, STEIN & SENOIR
600 Third Avenue, 11th Floor
New York, NY 10016-1903

WARREN PUMPS, INC.
82 Bridges Avenue
Warren, MA 01083

WEIL-MCLAIN,
   a division of THE MARLEY COMPANY
500 Blaine Street
Michigan City, IN 46360

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
———————————————————————————X     Index No.:

—————————————————————————————     Date Filed:

LEON N. TERRANO,

                              Plaintiff(s),

                    -against-                              **VERIFIED**
                                                          **COMPLAINT**

A.W. CHESTERTON COMPANY,
ANCHOR PACKING COMPANY,
AURORA PUMP COMPANY,
BELL & GOSSETT COMPANY,
BMCE INC.,
    f/k/a UNITED CENTRIFUGAL PUMP,
BUFFALO PUMPS, INC.,
BYRON JACKSON PUMPS,
CBS CORPORATION, a Delaware Corporation,
    f/k/a VIACOM INC. successor by merger to CBS
    CORPORATION, a Pennsylvania Corporation,
    f/k/a WESTINGHOUSE ELECTRIC CORPORATION,
CERTAIN TEED CORPORATION,
CLEAVER BROOKS COMPANY, INC.,
CRANE CO.,
DURABLA MANUFACTURING COMPANY,
EMPIRE-ACE INSULATION MFG. CORP.,
FOSTER WHEELER, L.L.C.,
GARDNER DENVER, INC.,
GARLOCK SEALING TECHNOLOGIES LLC,
    ~~f/k/a GARLOCK INC.,~~
GENERAL ELECTRIC COMPANY,
GOULDS PUMPS, INC.,
IMO INDUSTRIES, INC.,
INGERSOLL-RAND COMPANY,
ITT CORPORATION,
J.H. FRANCE REFRACTORIES COMPANY,
JENKINS VALVES, INC.,
KENNEDY VALVE MANUFACTURING Co., Inc.,
OWENS-ILLINOIS, INC.,
PATTERSON PUMP COMPANY,
PREMIER REFRACTORIES, INC.,
    f/k/a ADIENCE, INC., f/k/a BMI,
RAPID-AMERICAN CORPORATION,
THE FAIRBANKS COMPANY,
TRANE U.S. INC., f/k/a AMERICAN STANDARD INC.,
U.S. RUBBER COMPANY (UNIROYAL),
WARREN PUMPS, INC.,
WEIL-MCLAIN,
    a division of THE MARLEY COMPANY,

                              Defendants.

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

——————————————————————————————X

Plaintiff(s), LEON N. TERRANO, by their attorneys WEITZ &

LUXENBERG, P.C., upon information and belief, at all times hereinafter mentioned alleges as

follows:

1.    Plaintiff(s), LEON N. TERRANO, by their attorneys, WEITZ &

LUXENBERG, P.C., for their **verified complaint** respectfully alleges:

2.    Defendant AURORA PUMP COMPANY, was and still is a duly

organized domestic corporation doing business in the State of New York.

3.    Defendant AURORA PUMP COMPANY, was and still is a duly

organized foreign corporation doing business and/or transacting business in the State of New

York and/or should have expected its acts to have consequences within the State of New York.

4.    Defendant BELL & GOSSETT COMPANY, was and still is a duly

organized domestic corporation doing business in the State of New York.

5.    Defendant BELL & GOSSETT COMPANY, was and still is a duly

organized foreign corporation doing business and/or transacting business in the State of New

York and/or should have expected its acts to have consequences within the State of New York.

6.    Defendant BUFFALO PUMPS, INC., was and still is a duly organized

domestic corporation doing business in the State of New York.

7.    Defendant BUFFALO PUMPS, INC., was and still is a duly organized

foreign corporation doing business and/or transacting business in the State of New York and/or

should have expected its acts to have consequences within the State of New York.

8.    Defendant BYRON JACKSON PUMPS, was and still is a duly organized

domestic corporation doing business in the State of New York.

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

9.    Defendant BYRON JACKSON PUMPS, was and still is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

10.    Defendant GARDNER DENVER, INC., was and still is a duly organized domestic corporation doing business in the State of New York.

11.    Defendant GARDNER DENVER, INC., was and still is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

12.    Defendant IMO INDUSTRIES, INC., was and still is a duly organized domestic corporation doing business in the State of New York.

13.    Defendant IMO INDUSTRIES, INC., was and still is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

14.    Defendant ITT CORPORATION, was and still is a duly organized domestic corporation doing business in the State of New York.

15.    Defendant ITT CORPORATION, was and still is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

16.    Defendant JENKINS VALVES, INC., was and still is a duly organized domestic corporation doing business in the State of New York.

17.    Defendant JENKINS VALVES, INC., was and still is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

18.    Defendant KENNEDY VALVE MANUFACTURING Co., Inc., was and still is a duly organized domestic corporation doing business in the State of New York.

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

19.     Defendant KENNEDY VALVE MANUFACTURING Co., Inc., was and still is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

20.     Defendant THE FAIRBANKS COMPANY, was and still is a duly organized domestic corporation doing business in the State of New York.

21.     Defendant THE FAIRBANKS COMPANY, was and still is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

22.     Defendant WARREN PUMPS, INC., was and still is a duly organized domestic corporation doing business in the State of New York.

23.     Defendant WARREN PUMPS, INC., was and still is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

Plaintiff(s), LEON N. TERRANO, repeats and realleges NYAL - WEITZ & LUXENBERG, P.C. STANDARD ASBESTOS COMPLAINT FOR PERSONAL INJURY No. 7 as if fully incorporated herein as it pertains to the defendants in the aforementioned caption.

Dated: *April 08, 2008*
New York, New York

Yours, etc.,

WEITZ & LUXENBERG, P.C

Attorneys for Plaintiff(s)
180 Maiden Lane
New York, NY 10038
(212) 558-5500

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

STATE OF NEW YORK     )

                                 SS:

COUNTY OF NEW YORK  )

The undersigned, an attorney admitted to practice in the Courts of New York State,

shows:

Deponent is an Associate of the firm WEITZ & LUXENBERG, P.C., Counsel for the

plaintiff(s) in the within action; deponent has read the foregoing **summons and verified**

**complaint** and knows the contents thereof; the same is true to deponent's own knowledge, except

as to the matters therein stated to be alleged on information and belief, and that as to those

matters deponent believes it to be true.  This verification is made by deponent and not by

plaintiff(s) because plaintiff(s) resides outside of the County of New York where plaintiffs'

counsel and deponent maintain their office.


Dated: April 08, 2008
       New York, New York

                                          AMBRE BRANDIS

Index No.:

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

LEON N. TERRANO,

Plaintiff(s),

-against-

A.W. CHESTERTON COMPANY, et. al.,

Defendants.

## SUMMONS and COMPLAINT

WEITZ & LUXENBERG, P.C.
Attorneys for PLAINTIFFS
180 Maiden Lane
New York, NY  10038
212-558-5500

To
Attorney(s) for

Service of a copy of the within
is hereby admitted.

Dated, April 08, 2008

Attorney(s) for

## Leon N. Terrano Service Rider

JULIE EVANS, ESQ.
ERIK C. DIMARCO, ESQ.
WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER
150 EAST 42ND STREET
NEW YORK, NY 10017-5639
PHONE # (212) 490-3000
FAX # (212) 490-3038
JULIE.EVANS@WILSONELSER.COM
COUNSEL FOR A.W. CHESTERTON CO.

THEODORE EDER, ESQ.
SEGAL McCAMBRIDGE SINGER & MAHONEY
830 THIRD AVENUE, SUITE 400
NEW YORK, NY 10022
PHONE # (212) 651-7500
FAX # (212) 651-7499
TEDER@SMSM.COM
COUNSEL FOR ANCHOR PACKING CO., BYRON JACKSON PUMPS, GARDNER DENVER, INC., AND GARLOCK SEALING
TECHNOLOGIES LLC f/k/a GARLOCK, INC.

LAWRENCE MCGIVNEY, ESQ.
MCGIVNEY& KLUGER, P.C.
80 BROAD ST., 23RD FLOOR
NEW YORK, NY 10004
PHONE 212 509-3456
FAX 212 509-4420
LMCGIVNEY@MCGIVNEYANDKLUGER.COM
COUNSEL FOR AURORA PUMP CO.,THE FAIRBANKS CO., AND PATTERSON PUMP CO.

ART BROMBERG, ESQ.
WEINER LESNIAK LLP
629 PARSIPPANY ROAD
P.O. BOX 438
PARSIPPANY, NJ 07054-0438
PHONE # (973) 403-1100
FAX # (973) 403-0010
ABROMBERG@WEINERLESNIAK.COM
COUNSEL FOR BMCE, INC. f/k/a UNITED CENTRIFUGAL PUMP

PHILIP GOLDSTEIN, ESQ.
MCGUIRE WOODS LLP
1345 AVENUE OF THE AMERICAS, 7TH FLOOR
NEW YORK, NY 10105
PHONE # (212) 548-2100
FAX # (212) 715-2315
PGOLDSTEIN@MCGUIREWOODS.COM
COUNSEL FOR BELL & GOSSETT CO., ITT INDUSTRIES, INC., AND TRANE U.S. INC., f/k/a AMERICAN STANDARD INC.

EDWARD WILBRAHAM, ESQ.
JOHN HOWARTH, ESQ.
WILBRAHAM, LAWLER & BUBA
1818 MARKET STREET, SUITE 3100
PHILADELPHIA, PA 19103
PHONE # (215) 564-4141 FAX # (215) 564-4385
EWILBRAHAM@WLBDEFLAW.COM
COUNSEL FOR BUFFALO PUMPS, INC.

WILLIAM BRADLEY, ESQ.
JOSEPH CARLISLE, ESQ.
MARY ELLEN CONNOR, ESQ.
MALABY, CARLISLE & BRADLEY LLC
150 BROADWAY
NEW YORK, NY 10038
PHONE # (212) 791-028500
FAX # (212) 791-0286
WBRADLEY@MCBLLC.ORG
COUNSEL FOR CBS CORPORATION, a Delaware Corp., f/k/a/ VIACOM INC., successor by merger to CBS CORPORATION,
a Pennsylvania Corp., f/k/a WESTINGHOUSE ELECTRIC CORP., CLEAVER BROOKS CO., J.H. FRANCE REFRACTORIES
CO., WARREN PUMPS, INC., AND WEIL-MCLAIN, a division of THE MARLEY CO.

JUDITH YAVITZ, ESQ.

REED SMITH LLP
599 LEXINGTON AVENUE
NEW YORK, NEW YORK
PHONE # (212) 205-6093/6022
FAX # (212) 521-5450
JYAVITZ@REEDSMITH.COM
COUNSEL FOR CERTAIN-TEED CORP.

KIRSTEN KNEIS, ESQ.
KIRKPATRICK & LOCKHART, NICHOLSON, GRAHAM, LLP ONE NEWARK CENTER, 10TH FLOOR NEWARK, NJ 07102 PHONE
# (973) 848-4000 FAX # (973) 848-4001
KKNEIS@KLNG.COM
COUNSEL FOR CRANE CO., AND JENKINS VALVES, INC.

WILLIAM MUELLER, ESQ.
CLEMENTE, DICKSON & MUELLER
218 RIDGEDALE AVENUE
MORRISTOWN, NJ  07961
PHONE # (973) 455-8008
FAX # (973) 455-8118
WMUELLER@CMT-LAW.COM
COUNSEL FOR DURABLA MANUFACTURING COMPANY

STEVE KEVELSON, ESQ.
ONE COZINE AVENUE
BROOKLYN, NY  11201
PHONE # (718) 649-4900
FAX # (718) 649-4902
COUNSEL FOR EMPIRE ACE INSULATION MFG. CORP.

MICHAEL A. TANENBAUM, ESQ.
SEDGWICK, DETERT, MORAN & ARNOLD LLP
THREE GATEWAY CENTER, 12th FLOOR
NEWARK, NJ 07102-5311
PHONE: (973) 242-0002
FAX:: (973) 242-8099
MICHAEL.TANENBAUM@SDMA.COM
COUNSEL FOR FOSTER WHEELER, L.L.C., AND GENERAL ELECTRIC CO.

DAVE SPEZIALI, ESQ.
SPEZIALI, GREENWALD & HAWKINS, P.C.
P.O. BOX 1086
1981 WINFLOW RD.
WILLIAMSTOWN, NJ 08094
PHONE # (856)728-3600
FAX # (856)728-3996
TRIAL COUNSEL FOR FOSTER WHEELER L.L.C., AND GENERAL ELECTRIC CO.

JOHN J. FANNING, ESQ.
CULLEN & DYKMAN
177 MONTAGUE STREET
BROOKLYN, NY  11201
PHONE # (718) 855-9000
FAX # (718) 935-1509
JFANNING@CULLENANDDYKMAN.COM
COUNSEL FOR GOULDS PUMPS, INC.

LISA M. PASCARELLA, ESQ.
PEHLIVANIAN, BRAATEN & PASCARELLA, LLC
2430 ROUTE 34
MANASQUAN, NJ 08736
PHONE # (732) 528-8888
FAX # (732) 528-4445
LP@PEHLI.COM
COUNSEL FOR INGERSOLL-RAND CO.

JOSEPH COLAO, ESQ.
HELEN CHUNG, ESQ.
LEADER & BERKON LLP
630 3RD AVENUE, 17TH FLOOR
NEW YORK, NY 10017

PHONE # (212) 486-2400
FAX # (212) 486-3099
JCOLAO@LEADERBERKON.COM
COUNSEL FOR IMO INDUSTRIES, INC.

JOHN A. SMYTH, III, ESQ.
MAYNARD, COOPER & GALE, P.C.
1901 SIXTH AVENUE NORTH
BIRMINGHAM, ALABAMA 35203-2618
PHONE # (205) 254-1000
FAX #  (205) 254-1999
JSMYTH@MAYNARDCOOPER.COM
COUNSEL FOR KENNEDY VALVE MANUFACTURING CO., INC.

PAUL A. SCRUDATO, ESQ.
SCHIFF HARDIN & WAITE
623 FIFTH AVENUE, SUITE 2800
NEW YORK, NY 10022
PHONE # (212) 753-5000
FAX # (212) 753-5044
PSCRUDATO@SCHIFFHARDIN.COM
COUNSEL FOR OWENS-ILLINOIS, INC.

JAMES M. SKELLY, ESQ.
MARKS, O'NEILL, O'BRIEN & COURTNEY, P.C.
530 SAW MILL RIVER ROAD
ELMSFORD, NEW YORK 10523
PHONE # (914) 345-3701
FAX # (914) 345-3743
COUNSEL FOR PREMIER REFRACTORIES, INC. f/k/a ADIENCE/BMI

LINDA YASSKY, ESQ.
SONNENSCHEIN NATH & ROSENTHAL
1221 AVENUE OF THE AMERICAS
NEW YORK, NY 10020
PHONE # (212) 398-5297
FAX # (212) 768-6800
LYASSKY@SONNENSCHEIN.COM
COUNSEL FOR RAPID AMERICAN CORPORATION



**AFFIDAVIT OF J. THOMAS SCHROPPE IN SUPPORT OF FOSTER
WHEELER'S NOTICE OF REMOVAL**

I, J. Thomas Schroppe, being under penalty of perjury, declare and say:

1.      I am a 1962 graduate of the New York State Maritime College with a degree in
Marine Engineering.  For three months in 1962, I worked as a Third Assistant Engineer for
American Export Lines.  I began my career at Foster Wheeler in 1962 as a Proposal Engineer
in the Marine Department.  As a Proposal Engineer, I was responsible for taking shipyard
specifications and designing a boiler to meet the thermal performance and physical
requirements of those specifications.  In 1967, I became the Manager of the Proposal
Department and reviewed all proposals.  In 1969, I was promoted to Vice President of
Engineering at which point I supervised both proposal and contract execution activities.
From 1975 to 1982, I was President of Foster Wheeler Boiler Corporation.  In 1982, I
became Managing Director of Foster Wheeler U.K.  From 1984 to my retirement in 1999, I
was Executive Vice President of Foster Wheeler Power Systems.

2.      I am personally familiar with the degree of supervision and control exercised by the
Navy and its agencies in procurement contracts with Foster Wheeler for boilers and auxiliary
equipment because I was personally involved in such contracts at all the various stages of
development, from inquiry and bid through production, testing, and sea trials and, ultimately,
acceptance.

3.      I submit this affidavit to attest to the degree of involvement, supervision, direction and
control exercised by the U.S. Navy and its authorized agents and officers in connection with
procurement contracts with Foster Wheeler for equipment to be installed aboard U.S. Naval
vessels. The following paragraphs describe the contract process from the perspective of Foster
Wheeler as the vendor, as well as the levels of interaction between Foster Wheeler and the
Navy agents and personnel through the various stages of a given contract.

4.      Foster Wheeler furnished and fabricated marine propulsion boilers and related auxiliary
systems for U.S. Navy, Maritime Commission, and Coast Guard ships under contract between
Foster Wheeler and the shipyards and/or the United States Navy Department and its authorized
agencies, officers and personnel (hereafter collectively referred to as the "Navy").

5.      The Navy was responsible for all phases of the design of a vessel, which was
accomplished by the Naval architect. Specifically, the Naval architect would prepare the ship
design which involved the entire vessel, including the machinery space, and all performance
requirements. In general, the ship design for any given class of ship would be contained in a
Ship Specification ("Ship Spec") which covers all aspects of the vessel including the machinery space.
As it relates to the boiler, the Ship Spec would cover all boiler operating criteria, performance
requirements, and maximum physical dimension of the boiler(s). In general, the Ship Spec was
written and prepared by the naval architect and approved by the Navy and, in the course of its
projects with the Navy, Foster Wheeler was required to design, fabricate and furnish equipment
which complied strictly with the requirements in the Ship Spec.

6.      In addition to the Ship Spec, Foster Wheeler was also obligated to comply with Military
Specifications ("Mil Specs") which cover all specific components of the boiler, including

accessories, subcomponents, and materials required to fabricate the boilers and its components.

7.    The normal process by which Foster Wheeler sold marine boilers to the Navy first involved receipt and response to an inquiry from either BuShips (Bureau of Ships) or the shipyard, depending on the Navy's procurement process. The boiler inquiry would be assigned to a proposal engineer in Foster Wheeler's marine department who would review the inquiry, which consisted of the Ship Spec and the associated drawings, for the performance requirements and size limitations of the boiler.

8.    The performance requirements are contained in the specifications, namely MIL-B18381 and the Ship Spec, which must be followed. I must point out that deviations from these specs were not acceptable as the boiler is just one piece of the entire power plant which was designed by BuShips or by a designated naval architecture firm such as Gibbs and Cox. In addition, the Foster Wheeler proposal engineer was aware that these requirements would be tested during the sea trials, so all calculations had to precisely conform with the Ship Spec.

9.    During the proposal phase, Foster Wheeler would prepare design drawings and related materials in conformance with the Ship Spec (which included performance specs and size limitations) and other requirements contained in MIL-B-18381 which was the Mil Spec pertaining to Naval propulsion boilers. I am personally familiar with the MIL-B-18381 as I saw it and referred to it throughout my career at Foster Wheeler. Foster Wheeler would prepare a proposal drawing and proposal specification that would outline the design and scope of material and equipment contained in the proposal. The boiler proposal submitted by Foster Wheeler would incorporate the specific requirements set forth in the Ship Spec and MIL-B18381.

10.    Approximately half way through the proposal process, information is forwarded to Foster Wheeler's estimating department to start to prepare an estimate of the boiler cost. In parallel, the proposal engineer starts calling vendors to obtain quotes for the various boiler accessories such as burners, sootblowers, gage glasses, safety valves, etc. All Navy approved vendors were asked to provide a quotation for the material in accordance with the Mil Spec covering their equipment or product.

11.    The finished boiler proposal consisted of an approximately 25 page booklet, a proposal drawing and an offering letter to the entity requesting a proposal so stating that the offering was in accordance with the Ship Spec and all required Mil Specs.

12.    The boiler proposal would be reviewed by the shipyard with the understanding that the proposed design, prepared specifically for the Navy in accordance with the Ship Spec. at issue, conformed to all appropriate specifications stated above. Once final price negotiations were complete, the contract was awarded to Foster Wheeler.

13.    The boiler specifications would provide detailed requirements for the boiler and would always reference the boiler Mil Spec (MIL-B-18381) which dictated very specific material requirements such as:

(a)    Boiler tubes: Type of tube, tube diameter, tube thickness, material, and tensile strength.

(b)    Refractory and Insulation: Specification identified the material, arrangement of various bricks and insulating materials on various boiler walls and provided specific Mil Specs for each type of insulating/refractory material.

(c)    Boiler accessories: All accessories applied to the boiler, such as burners, safety valves, soot blowers, must conform to a specific Navy Mil Spec for each such component.

14.    At receipt of an order the same Foster Wheeler proposal engineer is assigned the project as a contract engineer which will entail a more detailed recalculation of the thermal performance for the boiler. In addition, calculations of all the pressure drops, design of drum de-superheaters and final selection of all boiler accessories are made. All this work will be double checked by the head of engineering. In parallel, the contract engineer will commence discussions with the contract design department who will make all the drawings required for both manufacture, for submission to the shipyard and the Navy for review and approval. Foster Wheeler would not commence production of the boilers until the Navy issued final approval of these contract drawings. The approved drawings prepared during this phase would eventually be incorporated into the technical manuals.

15.    The contract design department also provides the material requisitions to the purchasing department so they may procure materials in accordance with Mil Specs. With regard to procurement of insulating and refractory material, the specific requirements for insulation and refractory items are listed in MIL-B-18381, which then references additional Mil Specs for each specific type of refractory/insulating material required. Foster Wheeler's procurement process would involve the purchasing department contacting the vendor and requesting a quotation for the material. The Foster Wheeler purchase order would reference the appropriate Mil Spec for each item shipped. The vendor, in turn, would supply materials that conformed to the Mil Spec and ship it directly to the shipyard. Finished products such as burners, sootblowers, and all refractory and insulating materials, etc. are shipped direct to the shipyard so they may be incorporated into the final boiler erection. Upon arrival at the shipyard, there would be a receipt inspection to ensure what was on bill of materials was delivered.

16.    During manufacture of the boiler, a Navy resident inspector was present at Foster Wheeler's shops. The Navy inspector would review all fabrication processes, welding procedures, pressure part welding, and all weld x-rays for conformity to Mil Specs. The inspector would also ensure that all materials used at this stage, e.g., steel, flanges, tubes, etc., conformed to applicable Mil Specs. All manufacturing was performed to drawings which had been reviewed and approved by the Navy.

17.     Once individual components (e.g., headers, tubes, pressure parts) were manufactured, inspected by a Foster Wheeler quality control inspector, and inspected and stamped with approval by the resident Navy inspector, the materials/components were moved to the shipping area. At this point, the boiler fabrication was complete, though the boilers were in a "knocked down" condition (unassembled) for shipment. The boiler components and related materials were wrapped and/or boxed in accordance with Mil Specs relating to packaging and shipment of materials, which is also referred to in Mil Spec MIL-B-18381.

18.     The knocked down boilers are then shipped from Foster Wheeler's facility to the shipyard for assembly. For those not familiar with Naval propulsion boilers, they are simply too large and heavy to be shipped assembled. The assembly is done by shipyard workers with a Foster Wheeler employee on site to interpret drawings and answer questions that may arise during the assembly process. Resident Navy inspectors also witness the boiler assembly process.

19.     A critically important inspection item is the hydrostatic test put on the boiler after complete assembly of the pressure parts. This test is a water pressure test of the boiler at 50% over the boiler design pressure. At this point, leaks, even small ones, are not acceptable to the Navy. Formal written acceptance at this stage by the Navy inspector is a requirement. The boilers now sit idle in the ship as the remainder of the engine room and the balance of the ship are being completed. It is at this point that all the engine room piping is connected to the various connections on the boiler. Following the piping tests (shipyard responsibility) the shipyard insulates all piping up to the boiler casings.

20.     Upon completion of the vessel by the shipbuilder, dock trials start to test the various machinery systems in the engine room. The boilers are run at low power since the main turbine cannot be run very fast at the dock because any higher powers would tear the ship loose from the pier. Full power testing is done during sea trials where all aspects of the boiler performance are thoroughly tested. Foster Wheeler would send a service engineer to witness these tests and answer any questions which may arise. Foster Wheeler frequently sent the contract engineer on the first ship of a new class to obtain first-hand data on the boiler performance. Sea Trials were performed on every ship and formal approval by the head Navy inspector was required. Any punch list items which were identified had to be corrected before final acceptance of the boilers.

21.     In addition to the above design, manufacture and testing there remains an obligation by Foster Wheeler to provide technical manuals for the boilers furnished in a given Navy contract. The Navy exercised intense direction and control over all written documentation to be delivered with its naval boilers such as engineering drawings, test reports and other technical data that could be used as needed by shipboard engineering officer during the life of the equipment. The Navy required that every piece of equipment be supplied with a defined number of copies of one or more technical manuals. Navy personnel participated intimately in the preparation of this kind of information and exercised specific direction and control over its contents. These manuals included safety information related to the operation of naval boilers only to the extent directed by the Navy.

22.      Furthermore, the Navy had precise specifications, practices and procedures that governed the content of any communication affixed to machinery supplied by Foster Wheeler to the Navy. Foster Wheeler would not be permitted, under the specifications, associated regulations and procedures, and especially under actual practice as it evolved in the field, to affix any type of warning or caution statement to a piece of equipment intended for installation onto a Navy vessel, beyond those required by the Navy.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing facts are true and correct. Executed this 16th day of March, 2006 at Newark, New Jersey.

J. Thomas Schroppe

THE STATE OF NEW JERSEY

ESSEX COUNTY                    )

Personally appeared before me this        day of March, 2006, J. Thomas Schroppe, who made oath that the statements contained in the affidavit above are true and correct to the best of his knowledge.

Subscribed and sworn to before me this _10th_ day of _March_ 2006. My commission expires _4/1/07_____

Notary Public    **HEDWIG BACHLER**
                 **A NOTARY PUBLIC OF NEW JERSEY**
                 **MY COMMISSION EXPIRES APRIL 1, 2007**



### AFFIDAVIT OF ADMIRAL BEN J. LEHMAN, U.S. NAVY, RETIRED
### IN SUPPORT OF FOSTER WHEELER'S NOTICE OF REMOVAL

I, Ben J. Lehman, understanding and being under the penalty of perjury, declare:

1.     I am a Rear Admiral, Retired, of the United States Navy [U.S. Navy]. I received notice of my commission as an Ensign in April, 1942 and commenced active duty in the U.S. Navy on June 1, 1942. Immediately prior to commencing active duty in the U.S. Navy, I attended the College of the City of New York. I had been a "student engineer" at the Mack Manufacturing Co. [Mack Trucks] in Allentown, PA and had been enrolled as a special student at Lehigh University, Bethlehem, PA from June 1941 until January 1942. I returned to the College of the City of New York in order to complete my course work there and then enter military service. I had already completed two years of U.S. Army ROTC. On entering active duty, the U.S. Navy ordered me to study naval architecture and marine Engineering at the Massachusetts Institute of Technology [MIT]. Later, I was ordered to the U.S. Naval Academy Post-Graduate School at Annapolis [now the U.S. Navy Post-Graduate School in Monterey, CA]. I received a Master of Science [SM] from Harvard University in 1949. I studied Design Philosophy and Advanced Stress Analysis at Stanford University in 1957 and 1958. In the U.S. Navy, I served as a Ship Superintendent and Dry Docking Officer at the New York Naval Shipyard [formerly the Brooklyn Navy Yard], between 1942 and 1944, as a Ship Superintendent at the San Francisco Naval Shipyard from September 1950 to May 1952, and as a Planning Officer at the Assistant Industrial Manager, San Francisco from 1952 to 1954. In the Navy, I have always been an Engineering Duty Officer. I was promoted to Rear Admiral in 1977 in the Naval Reserve. I was employed as an engineer by the General Electric Co. between 1946 and 1958, and by the Bethlehem Steel Co.'s Shipbuilding Division in 1949 and 1950. I held the positions of Director of Engineering at a major shipbuilding company in Seattle, WA from 1969 to 1972 and of Vice President of Engineering in

Pascagoula, MS from 1972 to 1975. During all these periods I have maintained close contact with the U.S. Navy. During times of civilian employment, I have had periods of active duty in the Department of Defense [DOD], the Naval Sea Systems Command [NAVSEA] in Washington, D.C., and shipyards. My experience has caused me to be thoroughly familiar with U.S. Navy specifications by means of which the U.S. Navy controlled its contracts and inspection procedures, and thereby controlled its suppliers. Since my retirement in 1982 my specific knowledge of new procedures has decreased. I have been an independent consultant since 1975. I have personal knowledge of the facts herein.

2.    I submit this Affidavit in support of Foster Wheeler's Notice of Removal to attest to the levels of direction, control, and supervision exercised by the U.S. Navy over the design and manufacture of equipment, including boilers and their auxiliary equipment [collectively referred to as "boilers"] designed and constructed for installation on ships of the U.S. Navy.

3.    During my service in the U.S. Navy as a Ship Superintendent, I was personally involved with supervision and oversight of ship's overhauls and alterations. I was fully aware that only boilers especially designed and built for the propulsion of U.S. Navy combat vessels, including Foster Wheeler boilers, could be installed. These were designed and manufactured in accordance with detailed specifications written, approved, and issued by the U.S. Navy, specifically NAVSEA or its predecessors, including the Bureau of Engineering.

4.    The U.S. Navy chain of command concerning ship construction comprised several layers. The Secretary of the Navy [subject to the President and Congress] had the ultimate authority related to contractual and technical control. An Under Secretary was directly concerned with ship acquisitions. The Under Secretary position has now been eliminated, and that authority now rests with the Chief of Naval Operations who provides NAVSEA with the

desired ship characteristics, and oversees its performance. In the 1930s, Foster Wheeler, as a boiler and heat exchanger manufacturer, was under the cognizance of the Bureau of Engineering. The representative of that Bureau at the plant was an Inspector of Naval Machinery. The Bureau of Engineering and the Bureau of Construction and Repair were combined in 1940 to create the Bureau of Ships: for a time Approvals were required from both the Inspector of Machinery and the Supervisor of Shipbuilding for the lead ships of a class. Later, the Inspectors of Naval Machinery were renamed Inspectors of Naval Material. About 1958, the Bureau of Ordnance was merged with the Bureau of Ships to form NAVSEA. As a reduction in the pace of shipbuilding continued, routine inspection responsibilities were assumed by a new organization: the Defense Contract Administration Services Agency [DCASA]. This organization had many responsibilities, but lesser technical qualifications. Technical questions were referred to the Bureaus [Commands] in Washington. Throughout all of these reorganizations there were no changes in the ultimate authorities or the responsibilities of those authorities. Suppliers of equipment and the builders of ships have had the U.S. Navy's acceptance of their products determined by representatives of different organizations at different times but NAVSEA or its predecessors always had the ultimate authority and the professional competence to accept or reject them.

5.    Under NAVSEA, as under its predecessors, the U.S. Navy's shipbuilding and acquisition of equipment for the ships comprised several levels of authority. Detailed technical control over ship design, construction, repair, and inspection was in NAVSEA. The Commander of Naval Supply Systems Command [NAVSUP] had contractual control of some procurements. Each of these two organizations had oversight responsibilities regarding, among other things, boilers manufactured for U.S. Navy vessels. Compliance with the specifications and standards was directly monitored by Inspectors of Naval Machinery under both these divisions: those

under NAVSUP generally worked on site at the supplier's [in this case Foster Wheeler's] manufacturing facilities and Machinery Superintendents or Inspectors of Naval Machinery carried out their responsibilities at the shipbuilding yards. Moreover, it was common in my experience for technical personnel from the Propulsion Equipment Groups of NAVSEA to inspect the manufacturing and quality assurance processes at supplier's plants and the boiler erection and inspection procedures at the shipyards. In my experience, it was machinery inspectors who exercised primary, front line control over the work performed for the Navy by suppliers such as Foster Wheeler in the production of boilers and other equipment. The Inspectors of Naval Machinery [or those with other titles who succeeded them] were responsible for assuring that contractors such as Foster Wheeler complied with the contract specifications every detail. Further, the Inspectors of Naval Machinery would report to their superiors any violations of, or failures to comply with specifications, refuse to apply their stamp of approval, and not authorize shipment. This was true whether the installation was to be done by government shipyards or government contract shipyards.

5.    The U.S. Navy retained the "final say" over the design of any piece of equipment, and made the ultimate decisions, whether engineering or contractual.

6.    Further, I can attest that the military specifications for boilers and other equipment intended for use on vessels of the U.S. Navy, known as "MilSpecs", were drafted, approved, and maintained by the U.S. Navy, specifically NAVSEA or its predecessors, to encompass all aspects of shipboard equipment, including the material requirements.

7.    These contract specifications reflected the state of the art and the special needs of vessels destined for combat. NAVSEA maintained and controlled the MilSpecs because it had direct contact with the forces afloat and the shipyards, and therefore superior knowledge of the

demands and requirements of vessels ready for combat, and the availability of processes and materials.

8.    The U.S. Navy's unique specifications for boilers were communicated to boiler suppliers such as Foster Wheeler when the U.S. Navy, either directly or through its contractors, issued a negotiated contract or a Request for Proposal for equipment. The U.S. Navy specifications included the nature of any communication affixed to boilers or other equipment supplied to the U.S. Navy.

9.    The U.S. Navy had complete control. It could not, and did not, permit its contractors to implement any changes. Every aspect of every item needed to be controlled because:

a.    it had to be consistent with the ability of the crew to operate the ship, especially on its combat missions;

b.    it had to be compatible with the ability of the crew to maintain the ship and perform emergency repairs during its service using materials and parts carried on board when shipyard assistance was not available;

c.    every item had to be functionally compatible, fit in the space available, and be maintainable and operable with materials available from the U.S. Navy's supply system.

10.    The U.S. Navy had complete control over every aspect of every piece of equipment. Military specifications governed every significant characteristic of the equipment used on U.S. Navy ships, including the instructions and warnings. Drawings for nameplates, the texts of instruction manuals, and every other document relating to construction, maintenance, and operation of the vessel was approved by the U.S. Navy. This control included the decision of which warnings should or should not be included. Thereby, the U.S. Navy controlled the decisions with regard to instructions and warnings on every piece of equipment. The U.S. Navy would not, and could not, permit any equipment manufacturer or supplier to interfere with the Navy's mission by placing warnings on any equipment [or in any instructions or manuals which accompanied the

equipment] on any U.S. Navy ships or in any shipyards in which U.S. Navy ships were built or repaired that might cause Sailors or workers to deviate from their mission or require the U.S. Navy to devote scarce resources to programs it deemed not essential, in its unilateral view.

11.     In addition to specifications for the design and manufacture of the equipment itself, the U.S. Navy also had detailed specifications that governed the form and content of the written materials to be delivered with the equipment, including boilers, supplied to the U.S. Navy. The U.S. Navy was intimately involved with and had final approval of all technical and engineering drawings, operating manuals, safety or hazard information and any other written information that accompanied or related to any piece of equipment.  The U.S. Navy determined the nature of hazards to be subject to any precautionary labeling and the content of such labeling. In short, the U.S. Navy dictated every aspect of the design, manufacture, installation, overhaul, written documentation and warnings associated with its ships and did not permit deviation from any of its contractors.

12.     The U.S. Navy would never permit a supplier to suggest, advise, or require any actions that would be disruptive to the normal operation of the ship in its primary function of defending our Country. Procedures for operation were taught and enforced by officers of all ranks, from Petty Officers to Captains. Any written material regarding procedures for working around boilers that differed would have interfered with the normal and necessary operations of U.S. Navy ships. Indeed, in its specifications for manuals the U.S. Navy specifically limited warning information to items and events dealing with the operation of equipment. By definition, the application or removal of insulation would not have been included.

13.     Asbestos was rampant throughout U.S. Navy ships. Sailors and civilian personnel were exposed at all times when they were aboard ships regardless of where they were stationed or where they worked. In order to protect all these individuals from exposure to asbestos, the U.S.

Navy would have had to allocate scarce resources to provide respiratory protection for all sailors and workers every hour of every day that they were on board. Implementing wet down procedures and creating containment areas would also have been required to implement effective industrial hygiene programs. The U.S. Navy made a conscious decision on allocation of its resources in light of its knowledge of the hazards of asbestos and its mission to protect our Country. The U.S. Navy conducted extensive research concerning the hazard of exposure to asbestos starting in the 1930's. In the early 1940's, the Navy's Bureau of Medicine and Surgery, in coordination with the U.S. Maritime Commission, set standards based on the report of Dr. Drinker and Fleischer and Marr. Through its participation in government programs and conferences into the 1980's, the Navy stayed abreast of the latest information, including the results of research. The U.S. Navy made a conscious and informed decision about how asbestos would be used on its ships and how exposures would be controlled, if at all, on its ships.

14.    The U.S. Navy would not have allowed its equipment suppliers, such as Foster Wheeler, to affix any warning related to any asbestos hazards on their equipment. This would have included boilers. Further, the U.S. Navy would not have allowed Foster Wheeler to place any warnings related to asbestos hazards in any written material provided by Foster Wheeler to the U.S. Navy or to a U.S. Navy contractor in accordance with its contracts, including its technical and operations manuals. To do so would have interfered with the U.S. Navy's mission and control of its ships and personnel.

I declare under penalty of perjury that the foregoing is true and correct, and that if called as a witness, I could competently testify to the foregoing facts, all of which are within my own personal knowledge.

Ben J. Lehman, Rear Admiral, U.S. Navy, Ret.

Before me, the undersigned officer, personally appeared Ben J. Lehman, Rear Admiral, U.S. Navy, Ret. known to me to be the person whose name is subscribed to the within instrument, and acknowledged that he executed the same for the purposes therein contained.

In witness whereof, I hereunto set my hand and official seal acknowledge.

Executed this __12th__ day of __July__ 2007.

On this 12 day of 07, 2007, before me, a Notary Public,



__Josh Martin__

MY COMMISSION EXPIRES __August 28, 2010__

JOSH MARTIN
NOTARY PUBLIC
STATE OF NEVADA
APPT. No. 05-109087-5
MY APPT. EXPIRES AUGUST 28, 2010